# Nutt *v.* The State.

### *Indictment for Murder.*

1. *Service of copy of indictment on prisoner; variance.*—When the defendant is charged with a capital offense, and is in actual confinement, the statute requires that he be served with a copy of the indictment, and of the list of jurors summoned for his trial (Code, § 4872); and if there is a material variance between the original indictment and the paper served as a copy, in the name of the deceased—as, Luke *Hadnett* instead of Luke *Hodnett*—this is not a compliance with the statute, and the defendant should not be ruled to trial.

2. *Verdict of guilty of less offense than charged.*—A verdict finding the defendant guilty of murder in the second degree, under an indictment for murder, operates as an acquittal of the higher offense; and on a second trial, after a reversal of the judgment, he can not be convicted of murder in the first degree.

3. *Murder in second degree.*—Murder in the second degree may be committed without an intention to take life. Mere words, no matter how insulting, never reduce a homicide to manslaughter. If one strike another, not in self-defense, with intent to maim him, and death ensue; or, if one kill another without intending it, in the attempt to commit a felony; in either case, he is guilty of murder in the second degree.

FROM the Circuit Court of Randolph.

Tried before the Hon. JOHN HENDERSON.

The prisoner in this case was indicted for the murder of Luke Hodnett, by striking him with a gun. On being arraigned, he pleaded not guilty, and a day was set for his trial; and he being in actual confinement, never having been admitted to bail, the court entered an order, directing the sheriff to "serve the defendant, in person, with a copy of the indictment, and a list of the jury to try this cause, one entire day before the day set for trial." When the cause was called for trial, on the day appointed, the defendant objected to going to trial, on the ground that this order of the court had not been complied with, inasmuch as, in the copy-indictment served on him, the name of the deceased was spelled Luke *Hadnett*, instead of *Hodnett*, as in the original indictment. The two papers being submitted to the inspection of the court, the State proposed to ask the clerk of the court what the name in the copy was; to which he answered, "that the word was intended for *Hodnett*, but that it looked more like *Hadnett*." To this evidence, both to the question and to the answer, the defendant objected, on the ground "that the copy must speak for itself, and that parol evidence was not admissible to prove what any particular word therein was." The court overruled the objection to the evidence, and required the defendant to proceed to trial; to which rulings, each, he duly excepted. The original indictment and the copy are sent to this court for inspection, under the certificate of the presiding judge, according to the rule of practice in such cases prescribed.

The bill of exceptions purports to set out all the evidence introduced on the trial, but it is not necessary to state it all at length. Only two witnesses were introduced to prove the circumstances immediately attending the homicide. Henry Hughley, one of these witnesses, thus testified: "Witness was with defendant on the morning of the difficulty, in the town of Wedowee, and went with him from the town to where Luke Hodnett was splitting rails, about a mile distant. When they got to where Luke Hodnett was splitting rails, defendant said to Hodnett, 'I have had a calculation made, and have come to have a settlement with you'; to which Hodnett replied, 'I have no money, and you will have to wait until I can get some before I can pay you.' Defendant replied: 'No, I intend to have what you owe me now.' Hodnett replied: 'I would suffer my right arm cut off, before I would fight as old a man as you are'; and defendant replied, 'I don't want to fight.' When defendant said this, Hodnett, who had been busily engaged splitting rails during the whole

conversation, and was standing with his back to defendant, immediately stooped, and placed his wedge in the rail-cut; and while rising, half bent, defendant struck him over the head with a gun while his back was to defendant, and then stepped back a few steps and struck him again with the gun, and started to strike a third time, when witness interfered and prevented him from doing so. Witness further testified, that there was no quarrel between the defendant and Hodnett, and that what is above set out was all that was said or done by them;" and his testimony on cross-examination was substantially the same. Washington Hodnett, the other witness for the State, thus testified: "Witness was present at the time of the difficulty between the defendant and Luke Hodnett, which occurred about 11 o'clock in the morning, in December, 1879, but he did not remember the day of the month. Witness was present when defendant and said Hughley came to where Luke Hodnett was splitting rails, and heard the conversation between them, and saw the difficulty. After some conversation between defendant and Luke Hodnett, they became engaged in a quarrel, in relation to a matter of indebtedness between them. Witness heard defendant say to said Hodnett, 'Do you make me out a liar?' and Hodnett replied, 'I'll make you out a liar or any thing else.' At this time they were standing face to face, and very close together; and when Hodnett said this, defendant struck him on the head with a gun two or three times, and then stamped him. Defendant then left the place of the difficulty, and witness left Luke Hodnett lying on the ground there; and he remained on the spot where he was knocked down by defendant, until witness went to Mr. Carpenter's, about a half-mile distant, and told what had happened; and witness, with some other persons at Carpenter's house, came back to the spot, and found Hodnett still lying there, and carried him to Carpenter's house, where he died on the evening of the next day." The testimony of this witness on cross-examination was, in several particulars, materially variant from his testimony in chief; but he adhered to his statement as to the conversation between the parties, and that they were standing face to face when the first blow was struck by the defendant. He said that he was about twenty feet distant from the parties, and was standing at the place where Luke Hodnett had been splitting rails; that said Hodnett was moving rails when the defendant came up and sat down on a log, "and remained sitting on the log until said Hodnett called him a liar;" also, that after the difficulty, and after the defendant had left, "said Hodnett and witness left the place together, and went within about one hundred yards

of Mr. Carpenter's house, when Hodnett stopped to wash his head in a branch, and told him to go to Wedowee after a doctor;" that he did as requested, stopped at Carpenter's house on his return, and then came with others to the branch where he had left Hodnett, and they carried him to Carpenter's house. Another witness for the State testified, "that he was present, on the morning before the difficulty, when defendant had a calculation made, showing the indebtedness of Luke Hodnett to him; that defendant told the person who made the calculation that he wanted to sue Hodnett for the amount; that said person informed him that Hodnett was insolvent, and a suit against him would be useless; and that defendant then said, "I'll go and see him, and show him the calculation, and if he don't pay me, he will have to settle with a doctor.'" It was proved, also, that Hodnett's skull was fractured by the blows he had received, and that he died on the next day from the effects of it.

The defendant requested ten charges to the jury, which were in writing, and which were refused by the court; exceptions being reserved to their refusal. Among these charges were the following:

"6. If the jury believe from the evidence that the defendant did not intend to take the life of Hodnett, but merely intended to beat him, the fact that said Hodnett died from the effect of the wound inflicted by the defendant does not show that the killing was with malice.

"7. If the jury believe from the evidence that, in point of fact, the defendant did not intend to kill said Hodnett, such want of intention to take life overturns any presumption of malice arising from previous threats made by defendant against Hodnett.

"8. The necessity that will justify the taking of life need not be actual, but the circumstances must be such as to impress the mind of the slayer with the reasonable belief that such necessity is impending.

"9. If the jury believe from the evidence that the defendant, at the time of striking Hodnett, had reasonable ground to believe that said Hodnett was about to strike him with an iron wedge, then defendant had a right to strike in self-defense, if he had reasonable grounds to believe that it was necessary to strike, in order to save himself from impending death, or great bodily harm.

"10. If the jury believe from the evidence that Hodnett, by giving defendant the lie, provoked the defendant to strike him, and the defendant unfortunately killed him, by beating him in such a manner as showed only an intent to chastise,

and not to kill him ; the law so far considers the provocation of contumelious behavior, as to adjudge it only manslaughter, and not murder."

SMITH & SMITH, for the defendant.

H. C. TOMPKINS, Attorney-General, for the State.

STONE, J.—In trials for capital offenses, the statute requires that the defendant, if in actual confinement, shall be served with a copy of the indictment, and of the list of jurors summoned for his trial, at least one entire day before the day appointed for his trial.—Code of 1876, § 4872. The rule of service is different, when he is not in actual confinement. The reason of this statute is, that the accused may be informed of the charge against him, so that he may prepare for his defense. The indictment charges the murder of Luke Hodnett. The paper served as a copy describes the slain as Luke Hadnett. The names are clearly not *idem sonans ;* and it follows, that a literal copy of the indictment was not, in fact, served on the defendant.—Whar. Amer. Cr. Law, § 596 ; *Sayres v. The State,* 30 Ala. 15 ; *Page v. The State,* 61 Ala. 16. The variance in the present case may appear slight, and possibly it may be assumed the accused was not misled by it. Still, it is a variance. A copy of the indictment was not served. If we were to disallow this objection, on the ground that the variance did not mislead, we enter upon an uncertain field of probabilities, and know not where we would find a limit. Better to err in favor of life and liberty, than to enter upon ground so dangerous. The statute guarantees to persons so charged the right to have a *copy* of the indictment upon which they are to be tried, and it is not for us to say anything less than a copy meets this requirement. The Circuit Court erred in ruling the defendant to trial.

2. We need not consider the charges bearing on the question of murder in the first degree. The jury acquitted the defendant of the highest grade of homicide, and found him guilty of murder in the second degree. He can not be again put on trial for a higher offense than that of which he was convicted—murder in the second degree.—*Bell & Murray v. The State,* 48 Ala. 684. So, whether the court's rulings on the crime of murder in the first degree were right or wrong, is immaterial in the further trial of this cause.

3. Murder in the second degree may be committed without an intention to take life. Mere words, no matter how insulting, never reduce a homicide to manslaughter. So, if

one strike another, not in self-defense, with intent to maim him, and death ensue; or, if one, in the attempt to commit a felony, kill another without intending it; in either case, he is guilty of murder in the second degree. Charges 6, 7 and 10 were rightly refused. In *Judge v. The State*, 58 Ala. 406, and *Mitchell v. The State*, 60 Ala. 26, we discussed these questions so fully, that we consider further comment on these charges unnecessary. Charges 8 and 9 we consider abstract, and they were rightly refused on that account, if on no other.

Reversed and remanded. Let the accused remain in custody, until discharged by due course of law.