# Tidwell *v.* The State.

### *Indictment for Murder.*

1. *Variance between original indictment and copy served on defendant.* A material variance between the original indictment and the copy served on the defendant (Code, § 4872), if timely objection be made to it, is sufficient ground for postponing the trial; but it is not available, on the trial, as an objection to the reading of the indictment to the jury.

2. *Proof of venue.*—Proof of the venue as laid, in a criminal case, is essential to the jurisdiction of the court, and forms a material element of the rights secured by law to the accused; and if it is not proved, a verdict of acquittal necessarily follows.

3. *Proof of county boundaries.*—The boundary lines of counties, as established by law, are seldom marked by natural objects or artificial monuments, and are sometimes referred to the lines established by the government surveys of the public lands, or to places designated by names, which change or become obsolete; and no survey or marking of the boundaries, and record thereof, being required by law, it is subject to parol evidence, and, when disputed, must be determined by the jury; but, when the facts are admitted, the location of the boundary is a question of law.

4. *Same; boundaries of Tuskaloosa county.*—That portion of the eastern boundary line of Tuskaloosa county, which was described in the statute organizing the county [Laws of Ala. 1818, p. 86) as "running southwardly along the main ridge dividing the waters of the Black Warrior from those of the Cahaba," has remained unchanged, and without further designation, for a period of sixty years; during which time, by common consent, without dispute, one particular ridge has been recognized by the county, its officers and citizens, as the "main ridge" mentioned; and this boundary, as thus established by continuous user and general reputation, can not be changed or affected by the fact that, within four or five years before the trial in this case, a map prepared by the Alabama Great Southern Railroad Company, not by sworn public officers, nor under legal authority, designates a different ridge as the dividing ridge referred to.

5. *Charge referring legal question to jury.*—A charge requested, which refers a mere question of law to the determination of the jury, is properly refused.

6. *Power of court in stating evidence to jury.*—The court has original, inherent power to state the admitted facts to the jury; and its statutory power, to "state the evidence when the same is disputed" (Code, § 3028), is not a limitation, but an enlargement of its inherent powers.

7. *Accidental or unintentional homicide.*—When human life is taken by misfortune or misadventure, while in the performance of a lawful act, exercising due care, and without intention to do harm, the law will excuse the slayer; but all these facts must concur, and the absence of any one will involve in guilt.

8. *Killing one person, when intending to kill another.*—The accused is not entitled to an acquittal because, while shooting at one person, he killed another: the degree of his guilt is the same that it would have been if he had killed the person at whom he shot.

9. *Sufficiency of evidence; charge as to.*—In a criminal case, the test
3

[Tidwell v. The State.]

of the sufficiency of the evidence is, whether it produces in the minds of the jury a moral conviction, to the exclusion of a reasonable doubt; and a charge requested which requires the exclusion of a "probable possibility," instead of a reasonable doubt, is calculated to confuse and mislead the jury, and is properly refused.

10. *Homicide by shooting and subsequent blows by different persons.* If the deceased was shot by one of the defendants, and the wound would certainly or probably have proved fatal, but death was hastened by blows subsequently inflicted by the other defendant, the latter can not apportion his own wrong; and if he intervened and struck the blows to aid and assist the former, both are equally guilty.

11. *Drunkenness, as excuse or defense.*—Voluntary drunkenness does not excuse nor palliate a criminal offense, and is only material, in cases of homicide, in determining the degree of the murder; hence, a charge requested, asserting that, "if-the defendants were so drunk as to be incapable of forming an intent or design to commit murder, they must be acquitted," is properly refused.

12. *Self-defense; former assault by deceased.*—A former quarrel and difficulty between the deceased and one of the defendants, "an hour or more before the killing," in which the deceased drew his pistol, can not be considered by the jury as bearing on the question of self-defense, when it is shown that the parties to the quarrel were at once reconciled, and that the deceased, at the time of the fatal rencontre, did and said nothing which could have created, in the minds of the defendants, an apprehension of present peril to life, or of grievous bodily harm.

FROM the Circuit Court of Tuskaloosa.

Tried before the Hon. WM. S. MUDD.

The indictment in this case was found at the October term of said court, 1880, and charged that the defendants, Hugh Tidwell, Albert Tidwell, and John Tidwell, "unlawfully and with malice aforethought, killed Solomon S. Ford, by shooting him with a gun or pistol, or by striking him with a gun." The defendants each pleaded not guilty, and were jointly tried on issue joined on that plea; John Tidwell being acquitted by the verdict of the jury, and the other two defendants being each found guilty of murder in the second degree, and sentenced to imprisonment in the penitentiary for the term of eighteen years. On the trial, as the bill of exceptions states, "when the solicitor for the State was about to read the indictment to the jury, objection was made to the reading thereof, for the reason, as alleged, that the copies served on the defendants did not correspond with the said indictment; the difference consisting in the omission of the words "*or pistol,*" as used in the indictment. The court overruled the objection, and allowed the indictment to be read to the jury; and the defendants excepted."

"The State introduced evidence tending to show that said Ford, the person named in the indictment, was killed on the night of the 17th July, 1880, at a place called Green Pond, on the Alabama Great Southern railroad, in this State. The witnesses introduced to prove the venue would not state, as a fact,

[Tidwell v. The State.]

that the place at which he was killed was in Tuskaloosa county, or within one-quarter of a mile of the line thereof; but they testified to the following facts on that point, which were admitted to be true, both by the State and by the defendants: That the deceased was killed at Green Pond, at or near the south-east corner of the north-east quarter of section eleven (11), township twenty-one (21), range six (6), west, in the Tuskaloosa land-district: That Green Pond, and the place at which the deceased was killed, had always been reputed, considered and acted on, as being in said county; and this fact had never been disputed, until about four or five years ago, when a map, purporting to show the lands of the Alabama Great Southern Railroad Company, in Tuskaloosa, Bibb, and other counties, was exhibited in the neighborhood of Green Pond: That there is a ridge dividing the waters of the Warrior and Cahaba rivers, on the east of Green Pond and the place where the deceased was killed; and this ridge had always been reported, considered and acted upon, as being the boundary line between Tuskaloosa county on the west and Bibb county on the east, until said map was exhibited in the neighborhood, as before stated; and this fact had never been disputed, until the appearance of said map. That there is another ridge, also, dividing the waters of the Warrior and Cahaba rivers, on the west side of Green Pond and the place at which the deceased was killed; and this ridge was represented on said map as being the boundary line between Tuskaloosa county on the west and Bibb county on the east; and according to the line as thus represented, Green Pond and the place at which the deceased was killed, being on the east of said ridge, are more than a quarter of a mile from any part of Tuskaloosa county: That after said map made its appearance in the neighborhood, some dispute or controversy has arisen as to the boundary line between Tuskaloosa and Bibb counties; but there had never been any prior to that time."

This being all the evidence on the question of venue, the court charged the jury, *ex mero motu*, as follows: "The following facts, testified to by the witnesses, are admitted by the solicitor and by the defendants to be true," stating the facts in the words above set out; "and I charge you, that if you shall believe from the evidence, and from the admissions made by the solicitor and the defendants, that the foregoing facts are true, then you should find that the deceased was killed in Tuskaloosa county." The defendants excepted to this charge, and requested the following, with other charges, which were in writing: "8. The State must prove beyond a reasonable doubt that the killing was either done within Tuskaloosa county, or within a quarter of a mile of the boundary line thereof, or the

[Tidwell v. The State.]

defendants cannot be convicted." "9. Every fact which the State is required to establish, must be proved beyond a reasonable doubt; and neither of the defendants can be convicted in this case, if the jury have a doubt of a reasonable nature in regard to whether the killing was in Tuskaloosa county, or within a quarter of a mile of the line." The court refused each of these charges, and the defendants excepted to their refusal.

As to the circumstances connected with the killing, the bill of exceptions thus states the evidence adduced: "The State introduced evidence showing that, several weeks before the killing, a difficulty had sprung up between the defendants and the deceased, growing out of the renting of a house, all the parties living near Green Pond; that there had been a quarrel between them on the Thursday night before the killing, and the defendants threatened the deceased; that all the parties were at Green Pond on Saturday evening, the night of the killing; that Albert Tidwell brought a double-barreled gun with him, and bought some powder and buckshot about dark, and loaded his gun; that said defendants and the deceased were boisterous; that John Tidwell and the deceased met in a grocery, when some angry words passed between them; that the deceased drew a pistol on said Tidwell, but some persons interfered, and prevented a difficulty then; that they walked out together, and soon returned into the grocery, apparently having made friends, and drank together; that this was an hour or more before the killing; that there seemed to be a good deal of firing of pistols; that the deceased shot off his pistol in the air, and there seemed to be a good deal of promiscuous firing of pistols about an hour or more before the killing. The storehouses of Blalock, Clifton and Lewis, it was shown, are situated in a row on the south side of the railroad, and facing it, about twenty-five or thirty feet from each other; Blalock's store, called the 'New York store,' being farthest up the road north-east, and Clifton's next; and that Clarkson's store is on the opposite side of the railroad, about ten feet from it, and about fifty feet from where Ford's body was lying after he was shot and killed. The evidence showed that, just before the deceased was killed, he and Albert Tidwell were close together in front of Clifton's store, said Tidwell having his gun; that the deceased, just before he was killed, said to one Randall Hill, a witness, ' *Take his gun away from him, don't let him kill me;*' that Hill took hold of the gun, which was lying across the arm of said Tidwell, and attempted to take it away from him, when Hugh Tidwell stepped up, and fired a pistol; that said witness, Hill, immediately turned and ran down the road, around the store of Lewis; that he did not see who was shot; that Hugh Tidwell followed after him, and fired two or

three shots in the direction he was running; that said Hill had no pistol, and did not fire back. One Pike testified, that he was standing within a few feet of the parties when Hill took hold of Albert Tidwell's gun, and when Hugh Tidwell fired the pistol, and he saw them; that when the pistol was fired, the deceased staggered, and began to sink; that as he was falling, and before he fell, Albert Tidwell struck him three blows with his gun; that as many as three blows were heard by persons across the railroad at Clarkson's store; that parties who were at said store went across the railroad, where the blows were heard, and found Ford lying on the ground, still alive, and the three defendants by him; that Hugh and Albert were holding up John Tidwell, who seemed to be very drunk; that Albert had the barrels of his gun in his hands, the stock being broken off, and lying on the ground near the body. The deceased was found to be shot, the ball entering his face a little under the eye, between the eye and nose, and ranged back, inclining a little downward, but did not pass out. The pistol shot was necessarily fatal, and death was caused by the gunshot wound and other wounds inflicted on his person. There were bruises on the upper part of the body and side, which, upon comparison, were made by the broken gun; and these blows were also necessarily fatal, from the force used, and the parts struck. After the killing, Hugh and Albert Tidwell walked up towards one of the stores, and one of them remarked, apparently to the other, ' *The damned rascal is dead.*' Hugh Tidwell said, '*If he was shot by me, he was shot with a Smith & Wesson pistol.*' Hugh Tidwell's pistol was examined, and its calibre corresponded with the size of the gun-shot wound on the deceased. It was testified to, also, that Albert Tidwell said, in speaking of the killing, that he would kill anybody who would attempt to take his gun away from him. These statements, by said Hugh and Albert Tidwell, were made freely and voluntarily.

"The State here rested, and the defendants then introduced George Lewis as a witness," whose testimony is thus stated: "I was present at Green Pond, and was sitting on the bench in front of Clarkson's store, just before the killing of Ford; and was talking with Mr. Garner, who was sitting on my left, and Mr. Loveless was sitting in a chair on my right. In about five minutes I heard the shooting, while sitting there; heard four or five pistol or gun shots fired rapidly, across the railroad, between the building I occupy, called Norwood's store, and Clifton's saloon. At the time of the firing, I heard one man running, and seemingly another after him. The men seemed to turn down the corner between my house and Mr. Miller's. The one running was shooting back, and the one pursuing was

[Tidwell v. The State.]

shooting forward. I got up, and went to my lodging room; and after staying there about a minute and a half, went back to Mr. Clarkson's. As I walked in, I saw Clarkson going up to where the shooting was. I had been in Clarkson's about a minute, when I heard considerable talking; and could distinguish Clarkson's voice in the conversation; and I remarked to Mr. Acker, that Clarkson was in the fuss. About that time Clarkson called, to come to him and close the doors. I then went to where I heard the shooting, and found Ford in a dying condition. He was still breathing when I got there, and I got there first. When I got to him, I had a lantern, or lamp, and no one was near or about him. While I was sitting over him, Clarkson came back, and Mr. Acker came up about the same time. Clarkson asked if he was dead, and he was in a few moments. At the time of the difficulty, John Tidwell was lying drunk under Blalock, Hickman & Solomon's store "

" The foregoing was all the evidence in the case, on either side;" and on this evidence, the defendants requested several charges in writing, of which the court refused the following:

" 1. If the jury believe, from the evidence, that there is a reasonable probability that Ford was killed by an accidental shot, then, under the evidence in this case, they must acquit the defendants."

" 2. Unless the jury are convinced from the evidence, beyond all reasonable doubts, that the deceased was not killed by an accidental shot, then, under the evidence in this case, they must acquit the defendants."

" 3. If there is a reasonable probability from the evidence that one of the defendants killed Ford in shooting at some other person, then, under the evidence, the killing was not murder; and the other two defendants, not doing the shooting, can not be convicted of any offense under the indictment."

" 4. If the jury believe, from the evidence, that there is a reasonable probability that Ford was killed by Hugh Tidwell, while shooting at Hill, or by Hill while shooting at said Tidwell, then, under the evidence in this case, the defendant can not be convicted."

" 5. If the jury believe, from the evidence, that there is a probable possibility that Ford was killed accidentally, or otherwise, by some party or parties other than the defendants, then the defendants can not be convicted."

" 9. Every fact which the State is required to establish, must be proved beyond a reasonable doubt; and neither of the defendants in this case can be convicted, if the jury have a reasonable doubt as to whether the killing was intentional or accidental, or whether the defendants participated intentionally in the killing."

[Tidwell v. The State.]

"12.   The jury can not convict Albert Tidwell, unless they believe, beyond all reasonable and rational doubts, that he participated in the killing before the fatal shot was fired; and if he did not participate in the same before said shot was fired, then nothing he did afterwards would render him liable to be convicted."

"13.   If the jury, though believing beyond a reasonable doubt that one or more of the defendants killed said Ford, still believe, from the evidence, that it is probable that the parties doing the killing were so drunk as to be incapable of forming an intent or design of committing murder, then the defendants must be acquitted."

"23.   If the jury believe, from the evidence, that the pistol shot was fired before any blows were struck with the gun, and that the pistol wound was necessarily fatal; then, no conviction can be had for striking with the gun after the fatal shot from the pistol, unless the party using the gun otherwise aided, abetted, or participated in the killing."

"24.   If the jury believe, from the evidence, that the deceased, a short time before the killing, attempted to assault one of the defendants with a pistol, and was pushing on a difficulty; then, the jury may consider this evidence, to show, as far as it goes, that if the deceased was killed by the defendants, they were acting in self-defense."

Exceptions were reserved by the defendants to the refusal of each of these charges. The exceptions reserved, as above stated, show all the points presented for revision in this court.

A. B. McEACHIN, S. A. M. WOOD, J. M. MARTIN, and BRAGG & THORINGTON, for the appellants.—1. There was a material variance between the original indictment and the copy served on the defendants. The statute is peremptory in requiring a copy of the indictment to be served on the accused (Code, § 4872); and the failure to comply with the requirement is not waived by not making the objection before the jury is sworn. *Robertson v. The State*, 43 Ala. 325; *Nutt v. The State*, 63 Ala. 180. If the objection was good in arrest of judgment, it is also available on error.—*Finley v. State*, 61 Ala. 201.

2.   Next to the *corpus delicti*, the venue is the most important fact to be established; and without it, there can not be a conviction in any criminal case. It is a "part of the crime," said the Supreme Court of Mississippi, in *Moore v. The State*, 55 Miss. 432; and the necessity of proving it, to sustain a conviction, is shown by numerous decisions of this court, cited in 1st Brickell's Digest, 514, § 922; also, *Gordon v. The State*, 55 Ala. 178; *Bain v. The State*, 61 Ala. 75; Wharton's Criminal Law, 280; 56 Geo. 36; 9 Texas, 269, 390. The venue

in this case, was a disputed fact. The boundary line between Tuskaloosa and Bibb counties, as originally established, was designated as the "main ridge" dividing the waters of the Black Warrior and Cahaba rivers.—Toulmin's Digest, 86. But this "main ridge" has never been authoritatively located; and while the people have regarded one particular ridge as the line, the only map offered in evidence designated another; and it was admitted that, since the publication of this map, there has been some dispute among the people as to the true location of the boundary. The probability, not to say presumption, is in favor of the correctness of the map, which was prepared by railroad officers, and doubtless from official surveys; and if it be correct, the offense was committed in Bibb county. The evidence was certainly conflicting, and the true location of the boundary was doubtful and disputed. Yet the court instructed the jury, as matter of law, that on the "admitted facts"—that is, on the facts stated, which showed that the location of the boundary line was a matter of dispute—the offense was committed in Tuskaloosa county. The charge was a clear invasion of the province of the jury, in taking away from them the decision of a disputed question of fact.—1 Brickell's Digest, 342, § 103; *McGehee v. Harrison,* 51 Ala. 522; *Hollingsworth v. Chapman,* 64 Ala. 7; *Jones v. The State,* 63 Geo. 456; *Crawford v. McLeod,* 64 Ala. 240; *Keith v. The State,* 83 N. C. 626; *Lunsford v. The State,* 9 Texas, 217; *Alsobrook v. The State,* 62 Ala. 24; *Schmidi & Smith v. Joseph,* 65 Ala. 476. That the facts stated were admitted to be true, did not authorize the court to assume the province of the jury, and to draw the inferences therefrom which only a jury could legally draw.—*Gunter v. Leckey,* 30 Ala. 599; *Marx v. Bell, Moore & Co.,* 48 Ala. 505. The charge was, moreover, a charge on the effect of the evidence, and was therefore erroneous, being given without request.—Code, § 3028; *Baker v. Russell,* 41 Ala. 279. The 8th and 9th charges requested were intended to meet the errors contained in the general charge of the court, and presented the question of venue in proper form to the jury; and they asserted the doctrine of reasonable doubt, which was ignored by the charge of the court.

3. The charges requested, as to the law applicable to an accidental or unintentional killing, were justified by the evidence, and asserted correct propositions. It was proved that there was "a good deal of promiscuous shooting;" and the testimony was very persuasive to show that Ford was killed by an accidental shot—either by the accidental discharge of Albert Tidwell's gun, while Hill was trying to take it away from him; or by a shot from Hugh Tidwell's pistol, fired at Hill while running; or by Hill, firing back at Hugh Tidwell. It was for the

[Tidwell v. The State.]

jury to determine which of these alternatives was true; if the first or the last, there was no guilt on the part of any of the defendants; if the second, only Hugh Tidwell was involved in any guilt, and he could not have been convicted of any higher offense than manslaughter. The evidence adduced by the State showed that Ford was killed by a "gun-shot wound," which is ·described; while Albert Tidwell only had a gun, and it was not proved to have been discharged that night, even accidentally. The conclusion seems irresistible, that Ford was killed by an accidental discharge of Albert Tidwell's gun, under circumstances which relieve him of any criminality, or by a gun discharged by some third person during the "promiscuous firing." The blows struck with the gun by ·Albert Tidwell, after the fatal shot had been fired, would not authorize his conviction.—Wharton's Criminal Law, 309 a.

H. C. TOMPKINS, Attorney-General, for the State.—1. There was no material variance between the original indictment and the copy.—*Smith v. The State*, 32 Maine, 369; *Goodman v. The State*, 5 Sm. & Mar. 510; *Short v. The State*, 7 Yerger, 513; *Fox v. The State*, 1 Dutch. N. J. 566; *Rodgers v. The State*, 50 Ala. 102. Besides, the objection came too late. *Wade v. The State*, 50 Ala. 164.

2. There was no dispute as to the facts bearing on the question of venue. On the admitted facts, the murder was committed in Tuskaloosa county, where the indictment was found. The State courts must take judicial notice of the boundaries of counties, and whether a given locality is in a particular county is a question of law.—*People v. Breese*, 7 Cowen, 429; *Vanderwerker v. People*, 5 Wendell, 530; *Chapman v. Wilber*, 6 Hill, 475; *State v. Tootle*, 2 Harr. 541; *Ross v. Reddick*, 1 Scam. 73. The county of Tuskaloosa having always claimed and exercised jurisdiction over the locality, the courts are thereby concluded in a collateral proceeding like this. *State v. Dunwell*, 3 R. I. 127. Even between private persons, on a direct issue as to a boundary, a location of the line by one, acquiesced in by the other for a number of years, is held to be conclusive. *A fortiori*, the exercise of jurisdiction over a particular locality by one county, acquiesced in by an adjoining county, must be conclusive in a proceeding like this.—*McCormick v. Barnum*, 10 Wendell, 104; *Kip v. Norton*, 12 Wendell, 127; *Baldwin v. Brown*, 16 N. Y. 359.

3. The several charges asked, based on the theory of an accidendal killing, were each erroneous, in claiming an acquittal, without regard to the degree of guilt which would have attached, if the person aimed at had been killed.—Clark's Manual, § 445, and authorities cited. These charges were properly

[Tidwell v. The State.]

refused, because each involved the proposition, that the subse-
quent blows with the gun, after the fatal shot had been fired,
would not involve the parties in the guilt of the murder, though
the death was thereby hastened.—*Morea v. The State*, 2 Ala.
275; 2 Bishop's Criminal Law, § 637; 1 Russell on Crimes,
702, mar. Voluntary drunkenness can never excuse a criminal
offense, though, in some cases, it may reduce the grade or de-
gree.—Clark's Manual, §§ 170-72.

BRICKELL, C. J.—The variance between the copy of the
indictment served on the accused, and the original to which
they pleaded, if an objection had been timely interposed,
would have been sufficient cause for postponing the trial. It
was not available as an objection to the reading of the original
indictment to the jury, informing them of the accusation on
which they were to render a verdict.—*Nutt v. State*, 63 Ala.
180; *Ezell v. State*, 54 Ala. 165; *Wade v. State*, 50 Ala. 164.

2. By the common law, all crimes are local, and prosecution
of them must be conducted in the county in which they are
averred to have been committed. The constitution guarantees
to the accused, "in all prosecutions by indictment, a speedy pub-
lic trial, by an impartial jury of the county or district in which
the offense was committed." The purpose of the common law,
and of the constitution, is satisfied, when the accused is secured
a trial by a jury of the county exercising undisputed jurisdic-
tion over the place at which the offense is charged to have been
committed, organized and established as a political subdivision
of the State. The locality of the offense enters into the juris-
diction of the court, as well as forming a material element of
the rights secured to the accused. It is always a question of
fact the prosecution is bound to prove, and it may be proved as
other facts material to the issue are proved. If not proved, a
verdict of acquittal must follow.—Whart. Cr. Ev. § 107.

3. The boundary lines of counties are but seldom marked
by natural objects, or artificial monuments, discernible by the
naked eye. Often they are referred to the lines of the govern-
mental surveys of the public lands, and sometimes to places
designated by names, which change, or become obsolete. There
is no provision of law requiring any survey and marking of the
boundaries, and a record of it as evidence of the fact. The
boundary is, of consequence, subject to parol evidence; and if
its location is matter of dispute, generally it must be left to a
jury to say where is its true location.—*Doe, ex dem. Miller
v. Cullom*, 4 Ala. 576.

4. The county of Tuskaloosa was established by an act of
the territorial legislature of February 7, 1818.—Laws of Ala.
86. The geographical limits and boundaries were defined; and

of these, the one now material has remained undesignated, and is described as "running southwardly along the main ridge dividing the waters of the Black Warrior from those of the Cahaba,"—two rivers flowing through the central and western part of the State. That there was more than one ridge or elevation of the earth's surface, dividing these waters, is apparent from the statute; and it was the main, or principal ridge, which is designated as the county boundary. From the organization of the county, until within the last four or five years, one of these ridges had been uniformly recognized as forming the boundary. There had been neither doubt nor dispute about the fact, and to it the county had exercised jurisdiction, and the citizens residing near to and within the boundary, having the deepest interest in the fact, and the best opportunities of ascertaining the precise line, had acquiesced, assuming the duties, bearing the burdens, and exercising the privileges of citizens of Tuskaloosa county. The territorial boundaries of public municipal jurisdictions, when they grow to be ancient, are unmarked by artificial monuments; and, when there is not of them higher evidence, may be proved by general reputation. *Morgan v. Mayor*, 49 Ala. 349; 1 Phil. Ev. (C. & H. Notes), note 87, p. 218–19. Long, continuous, uninterrupted user, when lines and boundaries depend upon statutory references to physical objects which are not well defined, is a practical interpretation of the statute courts must adopt, or involve the citizens relying upon it in embarrassments and uncertainties, not only as to rights of property, but as to personal rights.—Dillon on Mun. Cor., § 125, n. 1.

Until the "Alabama Great Southern Railroad Company," some four or five years previous to the trial in the court below, published a map designating the lands it claimed, and their location, the place of the homicide had been recognized as within the boundary of the county of Tuskaloosa. It was west of the ridge which was recognized as the main ridge dividing the waters of the Black Warrior and Cahaba rivers. There was no dispute about the fact. That map designated another ridge, situate further westward, as the boundary; and because of the designation, there grew up some dispute among the citizens, as to the true boundary. The map was not the work of sworn public officers, charged with the duty of ascertaining the boundaries of counties, and furnishing evidence of them; nor was its publication authorized by law. As to the boundary of the county, it was not evidence, and could not lessen the force of the general reputation, and the unbroken user for sixty years, that the line was on the other ridge.

Whether, upon these admitted facts, the place must not be deemed within the county of Tuskaloosa, was a pure question

[Tidwell v. The State.]

of law for the determination of the court. If there had not been an admission of the facts made upon the trial, in the presence of the court—if their existence had been matter dependent upon the credibility of the evidence; or, if the existence of the facts had been a conclusion to be deduced by the jury from the evidence,—the eighth and ninth charges requested should have been given. The facts being indisputable, because admitted, and from the facts the law recognizing or declaring the place of the homicide to be within the county of Tuskaloosa, the charges could not have been given without referring to the jury the determination of a mere question of law.—*Gunter v. Lecky*, 30 Ala. 591.

6. It was not without the province of the court to state to the jury the undisputed facts. True, the statute declares, "the court may state the evidence, where the same is disputed." Thereby the power of the court, as it was previously recognized, is enlarged. The original, inherent power of the court, to direct the attention of the jury to the undisputed evidence, is not thereby affected. We can not perceive that, in the charge given, or in the charges refused, referring to the venue, there is error. The accused have no just cause of complaint. They have been tried by a jury of the county, as its boundaries have been recognized from its earliest organization. Their right by the common law, and by the constitution, was a speedy trial by an impartial jury of the county having jurisdiction, and in fact exercising it with the acquiescence of all departments of the government, and of the adjacent county, over the place at which it is charged the offense was committed.—*Speck v. State*, 7 Baxter (Tenn.), 46.

7. The several instructions in reference to the killing of the deceased accidentally, were properly refused. Instructions to the jury must be founded on the evidence, and if they are not, though stating correct legal propositions, ought to be refused because abstract, and because of their tendency to mislead, and to divert the attention of the jury from the real issue.—1 Brick. Dig. 338, § 41. The bill of exceptions purports to state all the evidence; and there is an absence of any fact or circumstance tending directly, or by fair inference, to show that the killing was accidental—that it happened unexpectedly. Besides, an accidental or an unintentional homicide is not necessarily, as these instructions import, free from legal culpability. There are many facts and circumstances which may attend it, and render it criminal, and subject the perpetrator to punishment. If by misfortune or misadventure, while in the performance of a lawful act, exercising due care, and without intention to do harm, human life is taken, the law will excuse. There must, however, be a concurrence of these facts, and the

absence of any one will involve in guilt.—Whart. Hom. §§ 470–74.

8.　The third and fourth instructions are based on the proposition, that if the deceased was killed while one of the defendants was shooting at some other person, or at Hill, then the defendants should be acquitted.　It is scarcely necessary to say the proposition can not be supported.　Their guilt or innocence, in such a state of facts, would depend on an inquiry the instructions do not propound—upon the inquiry whether they would have been guilty or innocent, and, if guilty, of what degree of homicide, if the fatal blow had fallen upon and killed the person against whom it was directed.—Whart. Hom. §§ 42–47.　This inquiry the instruction withdraws from the consideration of the jury, and requires an acquittal of all guilt, simply because the fatal shot reached and killed a person against whom it was not aimed.

9.　The fifth instruction is ambiguous, and, if given in the terms requested, would have been calculated to confuse and mislead the jury, if it had not been explained.　The court may very properly refuse all such instructions.—1 Brick. Dig. 339, §§ 59–61.　It is not a *probable possibility* the evidence in a criminal cause ought to exclude, but a *reasonable doubt.*　The test is, whether the circumstances and facts in evidence produce in the minds of the jury a moral conviction, to the exclusion, not of possibilities, but of reasonable doubt.

10.　Though one of the defendants may not have participated in the shooting, and though from the wound inflicted by the shooting the deceased would have died most probably, or certainly ; yet, if death was hastened by the blows with the gun which he gave, he was guilty of murder, or other criminal homicide, according to the circumstances of the case.　It was not simply in the ordinary course of nature, by the visitation of God, that death came.　The unlawful and intentional violence of the defendant contributed to, and accelerated the termination of life ; *and it is not permitted to the offender to apportion his wrong.*—1 Russ. Crimes, 701 ; *State v. Morea,* 2 Ala. 275.　The 12th and 23d instructions were properly refused.

These instructions, it must be observed, do not assert that, if one person unlawfully inflicts a fatal wound, and, while the victim is languishing, he is killed by the separate, independent, unlawful act of another, the latter only is guilty of the homicide.　This erroneous proposition is asserted—that he who inflicted the first fatal blow is alone guilty, and the other, though with malice he gave the blow accelerating death, is guiltless.　And it must be observed, the proposition is asserted, though the author of the last violence, after the first blow was

[Otis v. McMillan & Sons.]

given, may have intervened in the affray in which that blow was given, to aid and assist him who inflicted it. In such case, the parties are jointly liable, and neither can be relieved because of the liability of the other.

11. Drunkenness, of itself, when voluntarily produced, does not excuse or palliate an offense. In cases of homicide, it may be material in determining the degree—whether it is murder in the first, or murder in the second degree. Willfulness, premeditation, and deliberation must concur with malice, to constitute murder in the first degree. These involve an inquiry into the state of the mind of the accused at the time of the killing; and, of consequence, it is proper to inquire whether he was then drunk or sober; and, if drunk, whether the intoxication rendered him incapable of premeditation and deliberation. Mere drunkenness, a mere temporary fit of intoxication, can not excuse a homicide.—*State v. Bullock*, 13 Ala. 413; *Mooney v. State*, 33 Ala. 419; *Beasley v. State*, 50 Ala. 149; *Pirtle v. State*, 9 Humph. 63. The vice of the charge requested, in reference to the drunkenness, is apparent. If given, it would have authorized an acquittal, though the jury may have been satisfied the homicide was malicious and voluntary.

12. The former assault, made by the deceased upon one of the defendants, was not a fact which could be considered as having a tendency to show that the homicide was in self-defense. The quarrel in which that assault was made, had been quieted, and the parties had come together on friendly terms. When the killing occurred, the deceased was not an assailant—by no act or word proceeding from him could either of the defendants have been impressed with an apprehension that they were in peril of life, or of grievous bodily harm. The 24th instruction was properly refused, for, if given, it would have served no other purpose than to mislead the jury.

We find no error in the record, of prejudice to the appellants, and the judgment must be affirmed.