## THE STATE OF KANSAS v. JAMES M. BEATTY.

1. CRIMINAL CASE — *Incompetent Juror — Overruling Challenge, Error.*
A person called to serve as a juror in a criminal case, who shows by his answers to questions touching his qualifications to serve as a juror, that he has formed and entertains an opinion with reference to the guilt or innocence of the accused that would require evidence to remove, is not a competent juror in the case, and it is error for the trial court to overrule a challenge for cause directed against him.

2. MURDER — *Incompetent Witness — Conversation.* At the trial of a person charged with murder, it is error for the trial court to allow the wife of the deceased to testify to a conversation she had with a person who claimed to be an attorney for the accused, the conversation not occurring in the presence or hearing of the accused.

*Appeal from Harper District Court.*

PROSECUTION for murder in the first degree.   From a con-
viction at the March term, 1890, the defendant *Beatty* ap-
peals.   The material facts fully appear in the opinion, filed
on February 7, 1891.

*Shepard, Grove & Shepard,* and *A. N. Cherry,* for appel-
lant.

*L. B. Kellogg,* attorney general, and *Geo. E. McMahon,*
county attorney, for The State.

Opinion by SIMPSON, C. : At the March term, 1890, of the
district court of Harper county, the appellant, James M. Beatty,
was convicted of murder in the first degree, for the unlawful
killing of one James W. Hutchinson.   The material facts de-
veloped at the trial are, that on the morning of July 24, 1889,
the dead body of James W. Hutchinson was found on the floor
of his house, situate in the city of Anthony.   He had been killed
by being struck in the back by several bullets, or pieces of bul-
lets, that had entered his vital organs, tearing and lacerating
them, producing probably instantaneous death.   The shot had
been fired through the south window of the room in which he
had been sitting upon a chair, convenient to a table on which
there was a lighted lamp.   The lower half of the sash of the
window had been removed, and a light screen or netting had
been fastened over the opening.   This netting was torn and
powder burned, and the right side of the window frame was
burned and blackened by powder, parts of the gun-wadding
adhered to the body, and other parts were scattered around
the room in which the body was found.   It seems that a muz-
zle-loading gun had been used, and that the muzzle had been
held close to the screen or netting, at the time the fatal shot
was fired.   The deceased had been seen and conversed with
by his neighbors on the preceding evening; a light had been
observed after dark in this room; an explosion as of a heavily-
loaded gun had been heard by his neighbors between nine and

ten o'clock the night before, and immediately after the shot
the light in his room disappeared.    The wife and four children
of the deceased were at the time of his death absent from home,
on a visit to their friends in the state of Iowa, and he was
consequently occupying the house alone.    Hutchinson at the
time of his death was twenty-nine years old.    He had been
married twelve years, and was dependent on his daily labor
for the support of his family.    He had been a resident of
Anthony for four years, and was a quiet, inoffensive man.

The appellant, James M. Beatty, had a wife and four chil-
dren.    He was a section-boss on one of the railroads, and
also owned a quarter-section of land in Harper county.    His
wife had gone to the state of Iowa in the preceding Febru-
ary with some of her children, and the remainder followed
her in June.    There is some evidence tending to show that
Beatty did not intend to live with her again.    After the de-
parture of his wife, the wife of the deceased did washing,
baking and mending for Beatty, and for some time in June
he took his meals at the house of the deceased, still sleeping
at his own.    It appears from the evidence of the wife of the
deceased, that the appellant talked to her several times about
going to the state of Iowa with him; that he told her
that he had parted with his wife forever; that her husband
did not treat her right; that she had to work too hard; that
if she was his woman she would not have to work so much;
that he could do better by her than her husband had done;
that he had furnished her money to buy tickets for her trip
to Iowa; and gave her funds with which to buy a trunk and
a hat; and had instructed her to tell her husband that this
money was sent to her by a brother in Iowa; but the woman
strongly denies that any other improper language ever passed
between them, or that any improper relations existed.    The
killing occurred shortly after 9 o'clock P. M.; the appellant is
shown to have purchased a pistol on the 22d of July, and
some musket caps; later, on the same day, he purchased
powder.    He was in a deep railroad cut on that day firing
the pistol.    On this day, the appellant boxed some of his

household goods and shipped them to Iowa, and sold the balance to a second-hand dealer. On the morning of the 23d of July, he stated to a neighbor that he had stayed all night with Hutchinson, the deceased, and that Hutchinson appeared down-hearted and despondent. On the 23d the appellant was seen with an old musket that he said had not been in use for nine or ten years; he went to a hardware store and purchased a box of cartridges; the next morning this box was found in his room, ten cartridges being missing, and eight wounds were found on the body produced by bullets. Early in the morning, after the body was found, footprints were discovered leading from a railroad track toward the house of the deceased. They were first observed at a point northeast of the house; they were traced west, making a circle around to the south side of the house, the side from which the fatal shot was fired. This peculiarity was noticed in one of the tracks: the upper had been torn from the sole of the right shoe near the toe, and extending, formed a lip, which made a distinct impression at each step where the ground was soft. These tracks were again traced going west from the south side of the house of the deceased. From the length of the stride, it seemed as if the person who made the tracks had been running, and had, on reaching the railroad track west of the house, plunged over the track into a pool of water formed by an embankment, while a few feet on either side was dry and hard ground. The tracks followed neither railroad track nor street, but ran across a piece of ground from which the surface had been removed, and which, on account of a recent rain, was soft, with little pools of water scattered through it. Some of the parties who had discovered and traced these tracks observed that one of the shoes of appellant had the marked peculiarity heretofore spoken of. Later in the day his shoes were taken, compared with these tracks, and it was found that the shoes fit the tracks precisely. A shirt was found hanging behind a door in the appellant's house; it was damp, and had plainly visible the butt of a gun impressed on the left breast, as if it had

been held in the act of shooting.   The gun used at the time
of the shooting was a muzzle-loading one, and paper had
been used for wadding, and small portions of it had adhered
to the body and were found scattered through the room
where the body of the deceased was found.   Several pieces
of the wadding were collected and found to be a portion of a
newspaper called the Wichita *Eagle*.   On the day of the kill-
ing a small roll of cotton batting, around which was wrapped
a Wichita *Eagle* of a date a year prior, was found in the
house of the appellant.   A portion of this newspaper had
been torn away, and in smoothing and straightening these
parts of the wadding found in the room of the deceased, it
appeared that they were taken from the newspaper around
the cotton batting.   These are some, if not all, of the most
important circumstances that tended to fasten the guilt on the
appellant, and are a sufficient statement to afford an easy
comprehension of the questions we are required to discuss
and determine.

I. The first contention of the appellant that we shall notice
arises on this state of facts:  The appellant was arrested on the
24th day of July, 1889; his preliminary examination, lasting
several days, was concluded on the 9th day of August, and on
the 18th day of September the county attorney filed an infor-
mation against him, charging the appellant with the killing
of *John* W. Hutchinson.   On the 2d day of October the ap-
pellant waived an arraignment and entered a plea of "not
guilty" to said information.   On the 8th day of January,
1890, the county attorney, by leave of the court, amended the
information by substituting the word James for that of John,
a mistake having been made in the information as to the first
name of the deceased, it being James instead of John, as stated
in the information.   The application to be allowed to make
this amendment was done in the presence of counsel for the
the accused, but he was not personally present in court when
leave was given and the amendment made.   The journal of
the court recites that at the time the amendment was allowed
the trial court ordered that a copy of the amended informa-

tion be served on the accused, which was done on the 8th day of January, 1890, at 2:20 o'clock P. M. of said day. On the 10th day of January, 1890, at the hour of 9:30 o'clock A. M., the appellant was arraigned and required to plead to the amended information, this being less than forty-eight hours after the service of the copy. The accused, by his counsel, objected to an arraignment at this hour — 9:30 o'clock A. M. — for the reason that forty-eight hours had not elapsed since the service upon him of a certified copy of the amended information. The trial court overruled the objection, and required the accused to plead; this he refused to do, and the court ordered a plea of not guilty to be entered on his behalf. On this state of facts the appellant bases two assignments of error; the first being that it was error to grant the application for leave to amend the information without his personal presence in court; and the second is, that he could not be required to plead until after the forty-eight hours had expired from the time of the service of the certified copy of the amended information; and hence, there is no arraignment and plea to support the verdict and judgment of conviction. Section 72 of the code of criminal procedure permits an amendment to the information, either in form or substance, at any time before the defendant pleads, without leave of the court. The information may be amended on the trial as to all matters of form, at the discretion of the court, when the same can be done without prejudice to the rights of the defendant. The section further prescribes that no amendment shall cause any delay of the trial, unless for good cause shown by affidavit. The occasion for this amendment was the discovery that a mistake had been made in the first name of the deceased; that it was James instead of John. This amendment was made on the 8th day of January, and the first trial commenced on the 10th; after it had progressed for days, the sickness of a juror caused the discharge of the jury and a continuance of the case until the March term following. At this term the trial was had from which this appeal was made.

We do not believe, under such circumstances, that the al-

lowance of the amendment was such an error, if error at all, that it affected any substantial right of the appellant. It was one of form rather than substance. It is unlike the case cited by counsel for appellant, (*Nutt v. State*, 63 Ala. 180,) because in that case a mistake was made in the last name of the deceased; here it was only in the first name. The court has ample power to allow such an amendment before the trial, nor is it necessary that the accused be personally present in order to give validity to such action. Under § 270 of the criminal code, as construed in the case of *The State v. Myrick*, 38 Kas. 238, "No person charged with a felony can be tried unless he be personally present during the trial." This probably means during every step and stage of the trial. This amendment was not made during the trial; if it had been, a different question might have been presented. It does not seem to us, by any fair construction of our criminal code, the personal presence in court of the accused is necessary to give validity to an amendment of the information against him, when such amendment is made before, and not during the trial.

On the other question, it appears that the defendant appeared, waived an arraignment, and entered a plea of not guilty to the original information. There is no complaint anywhere in the record that a certified copy of the original information had not been served upon the appellant for a period of forty-eight hours before he waived arraignment and plead. The question then presented is this: Was the amendment to the information of such a nature that a certified copy of the amended information should have been served? We have already stated that we regard this amendment one of form, rather than of substance. It was the correction of a mistake made in the first name of the deceased, and in the very nature of things it could not have resulted in misleading, surprising, or in any other manner affecting the substantial rights of this appellant. It did not change the nature of the offense, or could not in any way operate to the prejudice of the accused. It could not have been a good cause for delay, as no postponement or continuance of the cause was asked for on account of

it. Hence we cannot see that a certified copy of the amended information was required to be served on the accused. It is true the court below ordered it to be served, and it may be hat this was done more as a matter of convenience to the attorneys of the accused than as a matter of right to him personally. No error is predicated on the mistrial at the January term, and as a matter of fact, the trial upon which conviction was had was not commenced until two months after the service of a certified copy of the amended information upon the accused. It is true that the trial court demanded an arraignment and plea on the amended information, but unless the amended information changed the nature of the offense charged, or departed in some other substantial or material respect from the original, so as to plainly affect some substantial right of the accused, we are of the opinion that the waiver of arraignment and the plea to the original information is sufficient to create the issue and support the conviction.

II. The second cause of complaint is, that the trial court erred in overruling the challenge for cause made by the accused to the jurors Alphin, Kerke, Green and Ashlock. One of these jurors remained on the panel, and all the others were peremptorily challenged by the appellant, and he thereby unjustly exhausted three of his peremptory challenges. It is said that the jurors Alphin, Green and Ashlock testified on their *voir dire* examination that they had formed an opinion as to the guilt or innocence of the accused that would require evidence to remove. We quote the answers of Alphin to some of the questions propounded:

"Q. Have you formed any opinion as to the guilt or innocence of the defendant? A. I think I have.

"Q. Have you that opinion now? A. Well, I hardly know; if what I heard should turn out to be true, yes, I have.

. . . . . . . . . . .

"Q. Well, nothing has occurred to change your mind as yet? A. No, sir.

"Q. It will require something to change your mind? A. Why, yes, there would something new have to come up.

"Q. Different from what you have heard? A. Yes.

"Q. Then it would require evidence, would it not, to change the opinion you have?    A. I expect, if it was different from what I have heard."

The juror Green stated that, while he had expressed no opinion, there was an impression on his mind produced from reading accounts of the murder in the newspaper, and from what he heard at the time it occurred, as to the guilt of the accused, that would require some evidence to remove.    He also stated that, according to the general opinion and the press, the accused was guilty.    These two men were twice challenged for cause by the accused, but each challenge was overruled, and they were finally challenged peremptorily by the accused. The degree of fixity of the opinion touching the facts in issue, as tending to disqualify the juror who entertains it, varies considerably in the reported cases.    In most courts of last resort it is held that an opinion does not disqualify if it is based on rumor or newspaper statements, and the juror says upon oath that he can give an impartial verdict on the evidence.    In some states this rule has become statutory.    But if a juror have an opinion as to the guilt or innocence of the accused, even if based solely upon newspaper reports, so fixed as to require evidence to remove it, he is not competent, although he may believe that he can render an impartial verdict on the evidence.

It is said by Mr. Justice VALENTINE, in the case of *The State v. Miller*, 29 Kas. 43, that —

"Every person charged with a criminal offense, in Kansas, has a right to be tried 'by an impartial jury.' (Const., Bill of Rights, §10.)    Now, is a juror who possesses an opinion with respect to the guilt or innocence of the accused, and who has 'no doubt' as to the correctness of his opinion, an 'impartial' juror?    And is a juror who, having such an opinion, and who would continue to entertain the same until it should be removed by evidence, an impartial juror?    Suppose that this opinion was that the defendant was guilty: then, would it be possible for the juror to presume that the defendant was innocent, until the contrary was proved?    Would he not rather presume that the defendant was guilty, until the contrary was

proved? Section 228 of the criminal code requires that every defendant in a criminal prosecution shall be 'presumed to be innocent, until the contrary is proved.' Would the juror, in the case supposed, be competent under this section? Besides, § 205 of the criminal code provides that 'it shall be a good cause for challenge to a juror, that he has formed or expressed an opinion on the issue or any material fact to be tried.' Now, would the juror, in the case supposed, be competent under this section? But it may be said that the opinion of the juror in the present case was founded merely upon rumor. Now, there is nothing in the constitution, or in the statutes, providing, or even intimating, that a juror who has formed an opinion upon rumor only may be competent to serve in the case. It may also be said, in the present case, that the juror stated upon his *voir dire* that he had no bias or prejudice against the defendant, and would be governed entirely by the evidence in the case in making up his verdict, and that he believed that he could try the case impartially. The juror was probably sincere in stating this; and he probably could state the same again with the same sincerity, even though he may have heard all the evidence introduced on the trial of the case. Indeed, it is probable that every juror who tried the case could honestly state, if called upon to try the case again, that he believed that he had no bias or prejudice against the defendant, and would be governed entirely by the evidence in making up his verdict; and that he believed that he could try the case impartially. Men are seldom conscious of being biased or prejudiced, or of being in such a condition that they could not try any case impartially, and be governed entirely by the evidence introduced on the trial of the case.

" The fact, in the present case, that the juror had an opinion with respect to the guilt or innocence of the defendant, and that he had no doubt as to the correctness of his opinion, and that his opinion would remain until it should be removed by evidence, was sufficient to render the juror incompetent to serve in the case; and we think that the court below erred in overruling the defendant's challenge to the juror for cause."

Exactly to the same effect are the cases of *Jackson v. The State,* 77 Ala. 18; *Polk v. The State,* 45 Ark. 67; *Andrews v. The State,* 21 Fla. 598; *The State v. Ricks,* 32 La. An. 109; *Stephens v. People,* 38 Mich. 739; *Olive v. The State,* 11 Neb. 1; *People v. Carey,* 96 N. Y. 376; *McHugh v. The State,* 38

Ohio St. 153; *Frazier v. The State*, 38 id. 230; *The State v. Culler*, 82 Mo. 623; *Dejarnette v. Com.*, 75 Va. 867; *The State v. Meaker*, 54 Vt. 112.

Whenever it appears from the statements of a juror, when being examined touching his qualifications, that his mind is in such condition respecting the issue or any material fact to be proved at the trial, that it will require evidence to remove some opinion or impression that has become fixed, relating to such issue or material fact, it cannot be said that he is an impartial juror. An impartial man — one who extends to his fellow-men the humane presumptions of the law, and keeps his mind in such condition with reference to the accused that guilt must be affirmatively and conclusively shown before he is willing to convict, is such a juror as the law contemplates, and as the constitution and statutes of the state demand. Every person charged with the commission of a criminal offense has the constitutional right to be tried only by this class of persons serving as jurors. In this case both of the jurors Alphin and Green, having stated upon their examinations that they had an opinion; that there was an impression resting on their minds as to the guilt or innocence of the defendant that would require some evidence to remove, were incompetent, and it was error to overrule the challenges for cause that were directed against them.

1. Incompetent juror; overruling challenge, error.

III. The third cause for reversal insisted on is the error of the court in the admission of that part of the evidence of the wife of the deceased in which she related a conversation she had with Mr. A. N. Cherry, one of the attorneys of the accused. This conversation occurred in the state of Iowa, and took place while the accused was in prison at the city of Anthony. We are unable to discover any legal theory under which a conversation between two witnesses in a cause is admissible, except for the purpose of impeachment. What was said by the defendant in the jail to Mr. Cherry might be sworn to by Mr. Cherry (if it was not a professional conversation) as an admission that would bind the defendant, but we cannot

Tennis v. Rapid Transit Rly. Co.

understand what Mrs. Hutchinson said, that Mr. Cherry said, that the defendant said, could be received.   This evidence was objected to at the time it was given, and at the conclusion of the testimony given by the woman a motion was made to have it taken from the jury, but both objection and motion were overruled.   In both instances the trial court committed grave error.

2. Conversation; incompetent witness.

The errors noted compel a reversal of the cause, and the other questions so earnestly discussed by counsel on both sides need not now be determined, as they may not arise on another trial.

We recommend that the judgment be reversed, and a new trial granted.

By the Court: It is so ordered.

All the Justices concurring.