(79 South. 625)

ULLMAN BROS. v. STATE.   (7 Div. 496.)

(Court of Appeals of Alabama.   May 7, 1918. Rehearing Denied May 28, 1918.)

1. COUNTIES ☞7—BOUNDARIES—CONSTRUCTION OF STATUTES.

The point where Wills creek finally enters into Coosa river is the mouth of that stream referred to in the act of 1832 bounding Benton, now Calhoun, county and the act of 1836 (Acts 1835-36, p. 170), dividing St. Clair county and creating Cherokee county.

2. EVIDENCE ☞372(11) — BOUNDARIES—ANCIENT MAPS.

A map made pursuant to a legislative act for the purpose of locating the center of a county as a county site made before the passage of the act of 1858 (Acts 1857-58, p. 318), changing the name of the county, was admissible as an ancient map of what it tended to show in a suit involving county boundaries.

3. COUNTIES ☞8—BOUNDARIES — EXTRINSIC EVIDENCE.

Where a property owner contended that his property was not situated in the county in which it was taxed and the exact location of the boundary line between the two counties was uncertain in view of legislative acts and other matters of which the court took judicial knowledge, extrinsic evidence was admissible in determining the boundary.

4. COUNTIES ☞7—BOUNDARIES.

Where a property owner resisted a sale of his land for taxes on the ground that it was situated in another county, and the evidence showed that the boundary line of the taxing county had been recognized to include the land taxed for almost 75 years by federal, state and county officials as well as by the residents, such construction will be adhered to.

Appeal from Circuit Court, Cherokee County; W. W. Haralson, Judge.

Proceedings by the State against Ullman Bros. to sell land for taxes. A decree of sale was entered in the probate court, and on appeal a like decree was rendered, from which defendants appeal. Affirmed.

Knox, Acker, Dixon & Sterne, of Anniston, for appellants. F. Loyd Tate, Atty. Gen., Hugh White, of Gadsden, and Hugh Reed, of Center, for the State.

BROWN, P. J. Lands belonging to appellants located in section 20, township 12, range 8 east of the basis meridian in Alabama, were assessed for taxes by the tax collector of Cherokee county for the year 1914, and, on default being made in the payment of the taxes so assessed, the lands were condemned and ordered sold by appropriate proceedings, in the probate court of that county, and on appeal from that decree to the circuit court of Cherokee county, on trial by the court without the intervention of a jury, a like decree was rendered, and from that decree this appeal is prosecuted.

Appellants' contention in the court below and here is that these lands are situated in the county of Calhoun, and were not liable to assessment for taxes in the county of Cherokee. This presents a question of fact which the appellants contend must be determined from evidentiary facts within the judicial knowledge of the court, and without the aid of extrinsic evidence, and that therefore the trial court committed error in allowing appellee to offer proof showing that the boundary line dividing the counties of Cherokee and Calhoun had been recognized for nigh onto three-quarters of a century as being located south of the land in question, by the officials of the government, federal, state, and county, as well as the people residing along said boundary line, and that the territory in dispute had been recognized and treated as a part of the county of Cherokee, and that the county of Calhoun had made no effort to exercise authority in this territory until the year 1914. Appellant's contention is based upon the provisions of the acts of the Legislature creating the two counties and the government survey of fractional township 12, ranges 6 and 7 east of the basis meridian, showing the location of the mouth of Wills creek where it empties into the Coosa river. The first of these acts was passed in the year 1832, and provides:

"That all that tract of country, bounded as follows, to wit: Beginning at a point on the east bank of the Coosa river opposite the mouth

---

of Wills creek, thence due east to the line dividing the state of Alabama from Georgia; thence along said line to the line between townships 16 and 17; thence due west along said line to the east bank of the Coosa river; thence up said river to the beginning; shall constitute one separate and distinct county, to be called and known by the name of Benton" (now Calhoun, the name being changed to Calhoun by act approved January 29, 1858 [Acts 1857-58, p. 318]).

And the other, passed in 1836, entitled "An act to divide the county of St. Clair," and providing:

"That all that tract of country, bounded as follows, viz. beginning at a point on the east side of the Coosa river opposite to the mouth of Wills creek, thence due east with the north line of Benton county, to the line dividing the state of Alabama from the state of Georgia; thence along said line in a northwestern direction to a ridge dividing the waters of Big Wills creek from the waters of Little river and Yellow creek, in a southwestern direction to a ford on Big Wills creek to the beginning, shall constitute one separate and distinct county, to be called and known by the name of Cherokee." Acts 1835-36, p. 170.

[1] It appears from the survey above referred to and the field notes that the waters of Wills creek touch the Coosa river near the southern line of section 15, township 12, range 6, and this point is described by the field notes as "where Wills creek runs into Coosa river and out again," and finally empties into the river in the northeast quarter of section 22, township 12, range 6, a short distance south of the section line between sections 15 and 22. We have no hesitancy in declaring that the point where Wills creek finally enters into Coosa river is the mouth of that stream referred to in the acts above quoted.

Appellants' contention, then, is that starting from a point on the Coosa river opposite the mouth of Wills creek, as above indicated, the boundary line between the counties of Cherokee and Calhoun runs a due east course to the Georgia line, and passes immediately north of section 20, township 12, range 9 east. If there was nothing else in this case, it may be that this contention could be sustained; but we find that at the time of the passage of the act creating the county of Benton, which was subsequently changed to Calhoun, the territory embraced in that county immediately south of the line dividing the Cherokee and Creek Indians had not been surveyed, and the territory belonging to the Cherokee Indians had not been ceded to the federal government. And at the time of the passage of the act defining the boundaries of Cherokee county, the territory lying north of the Indian boundary line, including that embraced in Cherokee county, had not been surveyed; the survey of this territory being made in the year 1839. Therefore the only established line existing in this territory at the time of the passage of those acts was the Indian boundary line, between the tribes of the Cherokee and Creek Indians. We find

that by act approved December 30, 1834, the Legislature provided:

"That all that section of the country east of the Coosa river, commencing at the mouth of Wills creek, and running up said river to Childress' ferry, and from thence following the Georgia road from the said ferry to the Georgia line, be, and the same is hereby attached to Benton county, and the said Coosa river on one side and the Georgia road on the other, are hereby made and established as the county boundaries of the said counties." Acts 1834-35, p. 5.

And we note from the government surveys and field notes that the Georgia road was recognized as an established landmark and referred to in these surveys. By an act entitled "An act to attach a part of Benton county to Talladega county, and for other purposes," approved December 23, 1836, it is provided:

"That the county line of Benton and Talladega, shall commence at a point on the Coosa river, where the sixteenth and fifteenth townships intersect said river, thence east to a road leading from Driver's ferry to David Conner's, thence with said road to Benton and Talladega county line, which shall constitute a part of Talladega county, that the county line of Benton and Cherokee shall commence at a point on the Coosa river, four miles north of the mouth of Wills creek, thence east to the Georgia line; which shall constitute and be a part of Benton county." Acts 1836, p. 118.

By act approved January 27, 1843, entitled "An act to repeal in part an act entitled an act to attach a part of Benton county to Talladega county, and for other purposes, approved December 23, 1836," it is provided:

"That so much of the above-recited act as relates to the county of Cherokee, be and the same is hereby repealed.

"And be it further enacted, that all officers, both civil and military, residing within the limits of the territory contemplated by this act, to be reattached to the county of Cherokee, be and they are hereby authorized to continue to discharge the duties of their several offices for and during the time for which they were severally elected, and that all suits heretofore commenced in the circuit and county courts of Benton county against persons residing in the said territory, shall be transferred to the circuit court of the county of Cherokee, in the same manner that cases are transferred on a change of venue, any law to the contrary notwithstanding: Provided, the citizens residing in said territory shall not be compelled to pay any tax to build a court house and jail, in the said county of Cherokee." Acts 1843, p. 157.

And by act entitled "An act to alter and amend the boundary line between the counties of Benton and Cherokee," approved January 27, 1845, it is provided:

"That from and after the passage of this act, that the foot of the mountain which runs half a mile west of Arthur F. Alexander's house, in Cherokee county, be, and the same is hereby declared the boundary or dividing line between the counties of Benton and Cherokee.

"And be it further enacted, that all that region of country up to the line aforesaid, in which Resse P. Davis, Benjamin Wheeler, Floyd Wheeler, Arthur F. Alexander, Martin Wheeler, W. E. Williams and C. C. Arrington, at present reside, and is hereby declared to belong to, and form a portion of the territory of Benton county: Provided, however, that not more than two miles shall be taken from Chero-

kee county by the change of the line aforesaid." Acts 1844–45, p. 58.

And by act approved February 14, 1854, entitled "An act to fix the boundary line between the counties of Cherokee and Benton," it is provided:

"That from and after the passage of this act, the boundary line between the southeast corner of Cherokee county and the northeast of Benton county shall commence a half a mile west of A. T. Alexander's old place, and thence run due west to the Georgia line." Acts 1853–54, p. 218.

And by act approved February 1, 1856, entitled "An act to amend 'an act' to fix the boundary line between the counties of Cherokee and Benton," it is provided:

"That the word 'west,' where it last occurs in the first section of said act approved Feb. 14, 1854, be and the same is hereby stricken out, and the word 'east' inserted in lieu thereof." Acts 1855–56, p. 120.

And by act approved February 6, 1858, entitled "An act to change the line between Cherokee and De Kalb counties," it is provided:

"That from and after the passage of this act, the county line between the counties of Cherokee and De Kalb be and the same is hereby so altered and changed as hereinafter described.

"Be it further enacted, that whereas, the road known as the old Georgia road, leading from R. B. Whorton's to Rhea's bridge, on Big Wills creek, is now the line between said counties, shall, in consideration of the petition of certain citizens along said road, be so changed, as that the road known as the Gunter's landing road, leading from said Whorton's to Big Wills creek, near Jas. Hampton's, shall hereafter be the established line between said counties; and that the citizens so transferred to Cherokee county, shall be entitled to all the rights, privileges and immunities as other citizens of said county." Acts 1857–58, p. 319.

The appellee offered the testimony of one or more witnesses to the effect that for upward of 50 years the line dividing the counties of Calhoun and Cherokee had been recognized as touching the southwest corner of section 19, township 12, range 9 east, and running in a direction a little south of east and touching the southeast corner of section 25, township 12, range 10 east, making said line approximately two miles north of the old Indian boundary line, and that, during this time, the territory north of this line had been treated by the officials of both counties and by the people owning property in that territory as being in Cherokee county, that many of the officers of Cherokee county had been selected from that territory, and that that county had had supervision of the schools and roads in this territory, and that the voters in this territory voted in Cherokee county, and that jurors for Cherokee county had been selected from among the inhabitants of this territory, and that these lands were assessed for taxes in Cherokee county. The undisputed evidence shows that the officials of Calhoun county had never exercised any authority over these citizens or lands until 1914.

Appellee also offered evidence showing that one James Dobbs lived on said line in section 26, township 12, range 9 east, during the year 1875, and we find that by act of the Legislature approved February 19, 1875, it is provided:

"That James Dobbs, who is a liner between the counties of Cherokee and Calhoun, whose domicile and its curtilage is in Cherokee, some seventy yards north of east and west line dividing said counties, while his farm and principal part of his lands are located on the south side of said line, be, and he is hereby declared a citizen of Calhoun county, subject to pay taxes and to perform all public duties and entitled to all the rights and privileges and immunities attaching and appertaining to the citizens of Calhoun county." Acts 1874–75, p. 578.

It was also shown that one Collins, who resided in section 29, township 12, range 9 east, on the line above indicated and south of the land in question, was for a number of years elected and commissioned as a justice of the peace of Cherokee county, and was appointed and commissioned by the government as postmaster at Collins, in Cherokee county; said post office being located at the residence of said Collins. It was further shown that in the year 1849, a land patent was issued to "Thomas Armstrong of Cherokee county" to the southeast quarter of the northeast quarter of section 19, township 12, range 9 east, and signed by Zachary Taylor, as President of the United States.

[2] By act approved January 15, 1844 (Acts 1843–44, p. 160), entitled "An act to locate permanently the county site for the county of Cherokee, and for other purposes," certain persons named therein were appointed commissioners and empowered to make a survey of said county and locate the center thereof as the county site. This act was amended by a subsequent act approved January 27, 1846 (Acts 1845–46, p. 165), and for the purpose of locating the center of said county the commissioners were empowered, among other things, to employ a competent mathematician. On the trial, appellee offered in evidence what appears on its face to be an ancient map made in pursuance of this act, which tends to show that the line between the counties of Benton and Cherokee touched the southwest corner of section 19, township 12, range 9 east, and runs a little south of east to the southeast corner of section 25, township 12, range 10 east. This map was undoubtedly made before the act of 1858 changing the name of the county of Benton to Calhoun, and is within the rule recognizing ancient maps and ancient documents as competent evidence of what they tend to show.

By an act creating the county of Cleburne, approved December 6, 1866 (Acts 1866–67, p. 71), the northern boundary line of Calhoun county was recognized as touching the corner of fractional township 12, range 11, which is also the southeast corner of section 36, township 12, range 10 east.

[3] We find on file in the office of the Secretary of State a map of the several counties of the state of Alabama prepared by the Commissioner of the General Land Office of the United States, Department of the Interior, which shows that the line between the counties of Calhoun and Cherokee does not run a due east course, but commences at the southwest corner of the county of Cherokee and runs irregularly a little south of east until it strikes the line between Cleburne and Cherokee. This map also shows that Spring Garden, which in argument was admitted to be the birthplace of two of the able counsel appearing in this case, one representing the appellant, the other the appellee, both of whom avowed that they were proud of the fact that they were natives of Cherokee county, is in Cherokee county, and it is conceded that the boundary line contended for by appellant would place Spring Garden in Calhoun county, thus changing the nativity of said counsel. This map also shows that the post office of Collins is on or very near this line. In view of the acts of the Legislature above adverted to, and other matters of which the court must take judicial knowledge, there is such uncertainty as to the exact location of the boundary line between these two counties as to render extraneous evidence admissible in determining the questions presented by the record. This is in effect conceded by able counsel for appellant. We quote this from his brief:

"The mouth of Wills creek, however, being definitely settled (at least so far as the issue here is concerned) there was nothing in the acts of the Legislature that could possibly render the line uncertain, except the acts of 1845, 1854, and 1856, which are hereinafter set out in Exhibit A to this brief. Any indefiniteness or uncertainty created by these acts is entirely removed by the testimony of W. E. Williams, whose undisputed testimony shows that the part of the line referred to by the acts is some twelve or fifteen miles east of that part of the line which is here in question."

In Doe ex dem. Miller v. Cullum, 4 Ala. 576, it is said:

"The boundary lines of counties are but seldom marked by natural objects, or artificial monuments, discernible to the naked eve. Often, they are referred to the lines of the governmental surveys of the public lands, and sometimes to places designated by names, which change, or become obsolete. There is no provision of law requiring the survey and marking of the boundaries, and a record of it as evidence of the fact. The boundary is of consequence subject to parol evidence; and, if its location is a matter of dispute generally, it must be left to the jury to say where is its true location." Tidwell v. State, 70 Ala. 33.

In the case last above cited, it was said with reference to the boundary line of Tuscaloosa county:

"From the organization of the county until the last four or five years, one of these ridges had been uniformly recognized as forming the boundary. There had been neither doubt nor dispute about the fact, and to it the county had exercised jurisdiction, and the citizens residing near to and within the boundary, having

16 ALA.APP.—34

* * * interest in the fact, and the best opportunities of ascertaining the precise line, had acquiesced * * * and exercised the privileges of citizens of Tuscaloosa county. The territorial boundaries of public municipal jurisdictions, when they grow to be ancient, are unmarked by artificial monuments, and, when there is not of them higher evidence, may be proved by general reputation. Morgan v. Mayor, 49 Ala. 349; 1 Phill. Ev. (C. & H. notes), note 87, pp. 218, 219. Long, continuous, uninterrupted user, when lines and boundaries depend upon statutory references to physical objects which are not well defined, is a practical interpretation of the statute courts must adopt, or involve the citizens relying upon them in embarrassments and uncertainties, not only as to rights of property, but as to personal rights."

[4] These observations are pertinent to the case in hand. Here it is a matter of little or no importance to appellants whether their lands be situated in the county of Calhoun or the county of Cherokee, or whether they pay taxes to the one or to the other. On the other hand, it is of great importance to the public that the settled conditions that have existed for half a century be not disturbed, making appropriate the admonition of Proverbs, 22:28, "Remove not the ancient landmarks which thy fathers have set."

In Warren County v. Butler County, 6 Ohio S. & C. P. Dec. 536, it is said:

"It may be said to be the general rule of law that where a line has not actually been laid out, but the course and beginning point alone is given, and if that course is 'north,' it means 'due north,' or a straight line as near as it may be run; but, in giving construction to an old statute, such a fixed rule must give way to other conditions and considerations. The condition of things at the time the law was passed, the surrounding circumstances calling for the law, the manner in which it was received and interpreted by those who were affected by the law, are weighty, evidentiary facts in determining the meaning and intention of the Legislature as expressed by the law."

This rule has not only been applied by the Supreme Court in the construction of statutes, but it has been applied in the construction of the provisions of the Constitution. In construing section 72 of the Constitution, relating to appropriations out of the public treasury of the state, and the necessity for the maximum of such appropriations to be fixed by legislative enactment, it was said:

"The wisdom of the rule announced in the case supra, i. e., that to allow any person or officer to draw upon the treasury for unlimited amounts in effect delegates to that person or officer the power of appropriating the public money, so commends itself to the reason that, were the question altogether a new one in this state, we might feel inclined to appellee's view. But the question is not entirely new. This provision has been common to all the Constitutions of this state. In the Constitutions of 1819, and 1861 it appeared under the head 'General Provisions.' In the latter instruments it has appeared under the head of 'Legislative Department.' In Smith v. Speed, 50 Ala. 276, where may be found a brief statement of its historical development, it was said of the provision upon which appellee now relies that: 'In the light of its history, this constitutional provision is conservative, not restrictive or prohibitory of the legislative power over the public

revenue.' And in most of the older states where any question has been raised concerning its meaning and effect, it has been held not to prohibit indefinite appropriations such as that of the act under consideration, while the decisions to the contrary come from the newer western states. Now the diligence of counsel for appellant has brought to light many examples of appropriations made in this way from the beginning of the state's legislative history down to the date hereof, and it may be assumed, nothing appearing to the contrary, that from time to time as occasion arose during all these years these indefinite appropriations have been acted upon by the executive departments of the government, thus in one way or the other involving a long line of the state's legislative and executive officials in a necessarily implied approval of that interpretation of the provision which would sustain the act now in question, and providing a practical exposition of its meaning too strong and obstinate to be now shaken or controlled except upon a clear conviction of error. * * * However loose, unwise, or dangerous this mode of appropriating the public money may be deemed, the court, in view of the considerations to which we have adverted, is unwilling to hold that it is prohibited by the Constitution." State ex rel. Turner v. Henderson, 199 Ala. 244, 74 South. 346.

The same rule has been applied in a very recent case, in the construction of an important criminal statute, in which it was said:

"Moreover, if the construction were otherwise doubtful, the contemporaneous construction placed on the statute for 50 years, by the officers and the people of the state, would lead to rejecting the interpretation of the statute that a druggist violates the statute if he keeps open doors on Sunday and sells anything other than drugs. Those intrusted with the enforcement of the criminal laws of the state for 50 years have not so construed or regarded the law as being violated by druggists making such sales on Sunday. The statute for all these years has been construed as it now reads, and not as it read before the change wrought by the Penal Code of 1866," etc. Ex parte Stollenwerck (Supreme Court) 78 South. 454;[1] Endlich on Construction of Statutes, § 357; Roane County v. Anderson County, 89 Tenn. 259, 14 S. W. 1079; 11 Cyc. 349; Russell v. Robinson,

[1] 201 Ala. 392.

153 Ala. 331, 44 South. 1040; Edward County v. White County, 85 Ill. 390; Hecker v. Sterling, 36 Pa. 423; Jones on Ev. § 304.

The map offered in evidence, which on its face tends to show that it was made in compliance with the act of 1843, in locating Center, the present county seat of Cherokee county, tends to show that a survey of the line was made between the passage of the act authorizing such location and the act of 1858, changing the name of the county from Benton to Calhoun, and what was said in the case of State of Va. v. State of Tenn., 148 U. S. 503, 13 Sup. Ct. 728, 37 L. Ed. 537, is here appropriate:

"Independently of any effect due to the compact as such, a boundary line between states or provinces, as between private persons which has been run out, located and marked upon the earth, and afterwards recognized and acquiesced in by the parties for a long course of years, is conclusive, even if it be ascertained that it varies somewhat from the courses given in the original grant; and the line so established takes effect, not as an alienation of territory, but as a definition of the true and ancient boundary."

And again, in Indiana v. Ky., 136 U. S. 479, 10 Sup. Ct. 1051, 34 L. Ed. 329:

"It is a principle of public law, universally recognized, that long acquiescence in the possession of territory and in the exercise of dominion and sovereignty over it is conclusive of the nation's title and rightful authority. * * * No human transactions are unaffected by time. Its influence is seen in all things subject to change, and this is peculiarly the case in regard to matters which rest in memory, and which consequently fade with the lapse of time and fall with the lives of individuals. For the security of rights, whether states or individuals, long possession under a claim of title is protected. And there is no controversy in which this great principle may be invoked with greater justice and propriety than in a case of disputed boundary."

The rulings of the trial court in this case are justified by these authorities, and the judgment appealed from is affirmed.

Affirmed.