REL: May 19, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2022-2023

————————————————

### CL-2022-0848

————————————————

**Jim Barber et al.**

**v.**

**Jeffery K. Landrum**

————————————————

### CL-2022-0854

————————————————

**Randolph County Commission**

**v.**

**Jeffery K. Landrum**

**Appeals from Randolph Circuit Court
(CV-17-900045)**

EDWARDS, Judge.

This case involves the status of an unnamed road in Randolph County that begins at a point approximately one mile south of New Hope

Church on County Road 5 in Randolph County and runs to a point on the western bank of the Tallapoosa River below where Crooked Creek flows into that river. The point where the unnamed road intersects the western bank of the river is approximately one-and-one-half miles below the R.L. Harris dam.[1] A "County Road 968" sign was eventually placed near the beginning point of the unnamed road, but, for the sake of clarity, we will refer to the above-described road as "the unnamed road," except as the context otherwise dictates.

These appeals follow this court's decision in Randolph County Commission v. Landrum, 342 So. 3d 574 (Ala. Civ. App. 2021), which reversed an August 11, 2020, judgment entered by the Randolph Circuit Court ("the trial court") and remanded the case for the trial court to comply with Rule 19, Ala. R. Civ. P., regarding the recipients of property interests from or through C.C. Twilley, whose pertinent properties

---

[1]The Federal Energy Regulatory Commission issued a license to Alabama Power Company for the R.L. Harris hydroelectric project (formerly known as the "Crooked Creek Project") on December 27, 1973. Alabama Power Co., 3 FERC 63,036, 65,241 n.2 (1978). The R.L. Harris dam was completed in October 1982 and created Lake Wedowee.

consisted of timberland that abutted the unnamed road.[2]  342 So. 3d at 580.  On remand, Jim Caldwell, Peter E. Mari, John F. Mari, Peggy Neumayer, Bodie Caldwell, Scott Caldwell, Willie Caldwell, Sandra East, Lynda Woodall, Mary George Hay, Doris Ragsdale, Felix East, Jr., Mike Twilley, Janice Bryan,[3] Carol Ann Dewberry, David Twilley, Pamela Wellborn, Amelia Twilley, Suellen Rush, individually and as personal representative of the estate of Don Rush, and Nancy Rush (hereinafter referred to collectively as "the Twilley beneficiaries") filed a motion in the trial court alleging that they were the successors in title to C.C. Twilley through his deceased children, requesting that they be made parties to the action, adopting the pleadings and motions that had previously been filed in relation to their purported interests, and requesting that the trial court enter a judgment based on the trial proceedings that had already occurred rather than conducting a new trial.  The trial court granted that

---

[2]It is unclear from the record when C.C. Twilley acquired the properties abutting the unnamed road, and C.C. Twilley died at some time not revealed in the record.  Based on materials in the record, it appears likely that he was the same C.C. Twilley who died at some point before July 1, 1967, as discussed in Cahaba Forests, LLC v. Hay, 927 F. Supp. 2d 1273, 1278 (M.D. Ala. 2013).

[3]Bryan is referred to in some pleadings as "Janice Bryant."

motion, added the Twilley beneficiaries as parties to the action, and entered a judgment on June 10, 2022, in favor of Jeffery K. Landrum determining that the unnamed road was a public road and that a part of the unnamed road was a county road.

In appeal number CL-2022-0848, Jim Barber; Jimmy Goss;[4] Tommy Owens; Kevin Hyatt;[5] Tallapoosa Timberlands, LLC; Tallapoosa River Hunting Club ("the hunting club"), a nonprofit association; Resource Management Service, LLC ("RMS"); and the Twilley beneficiaries appeal from the June 2022 judgment. The Twilley beneficiaries and Barber, Goss, Owens, Hyatt, Tallapoosa Timberlands, LLC, the hunting club, and RMS are hereinafter referred to collectively as "the private-party defendants." In appeal number CL-2022-0854, the Randolph County Commission ("the Commission") also appeals from the June 2022 judgment.

In July 2016, Landrum purchased 34 acres of real property from David Stephens ("Landrum's property"). Landrum's property abutted

---

[4]Goss is referred to in some pleadings as "Jimmy Gross."

[5]Hyatt is referred to in some pleadings as "Kevin Hyiatt."

Crooked Creek, a tributary of the Tallapoosa River, and was located north and northwest of the unnamed road. Landrum's property did not abut the unnamed road, but the use of that road was necessary for him to access his property using one or more other roads or ways that ran in a northerly direction from the unnamed road through other property owned by the Twilley beneficiaries. We note that Landrum also owned other property abutting Crooked Creek but that property did not share a boundary with the property that he purchased from Stephens.

Based on the evidence presented at trial, when Landrum purchased his property from Stephens, the unnamed road had a County Road 968 sign near its beginning point at County Road 5 and no gate was present across the unnamed road. However, according to Landrum, in the fall of 2016, a gate was installed across the unnamed road a short distance from County Road 5, and the County Road 968 sign was no longer present. The gate remained open for a few weeks but eventually was closed and locked, apparently by the hunting club.

Landrum contacted Stephens about the gate, and Stephens informed Landrum that he had obtained a gate key from the hunting club to use the unnamed road to access his property, which Stephens had

visited only three or four times per year when he had owned that property between 1994 and 2016. Stephens testified that he did not recall a gate being absent near the entrance to the unnamed road from County Road 5; instead, he recalled that the gate had been moved further from the entrance in the late 1990s and that it had been open or closed depending on the time of the year, such as during hunting season.[6]

---

[6]There was conflicting testimony about whether there had been a gate located near the beginning of the unnamed road in the past. Testimony indicated that such a gate had been present at certain times after the 1970s, had been present during certain times of year, such as hunting season, or had been permanently present since 1961. Some of those who testified to the presence of the gate also testified that keys to one or more of the locks on the gate could be obtained either from the hunting club or from someone associated with timber-management operations occurring nearby. Also, there was testimony indicating that at least one gate had been present in the past that had restricted access to an area beside the unnamed road, but not to the unnamed road itself.

Stephens's testimony regarding the gate being moved would be consistent with an attempt to prevent access to the unnamed road via an older entrance to that road from County Road 5 after a new entrance had been created from that road at some point between 1974 and 1992, see discussion, infra. Similar testimony about a gate further from County Road 5 was provided by Charles Sparks, but he was not sure of when the one time he had been "stopped by a gate" "several years ago" (before the erection of the newest gate a few years before trial) had been. However, no definitive testimony was provided regarding when or why the new entrance had been created or why the gate, assuming it had been present, had been moved.

Landrum testified that he had also contacted Burrell Jones, who had been the County Engineer for Randolph County since 1990, about the gate that was erected after Landrum had purchased the Landrum property. According to Landrum, Jones had said that "the [c]ounty hadn't maintained the road in 20 years, and it was closed by abandonment, and he used the word 'prescription.'" Jones admitted at trial that, during his cursory record search, he had found no record indicating that the county had vacated the unnamed road, and his statement to Landrum that the unnamed road had been closed by abandonment supports an inference that the county had considered the unnamed road to be a county road at one time. See Bownes v. Winston Cnty., 481 So. 2d 362, 364 (Ala. 1985) (explaining that, in the absence of a proper vacation of a road by a county pursuant to Ala. Code 1975, § 23-4-1 et seq., or by abutting landowners pursuant to Ala. Code 1975, § 23-4-20 et seq., "[a] public way or easement of passage which the public has in respect to a highway may be abandoned and thus lose its public character in one of two ways. Nonuse for a period of 20 years will operate as a discontinuance of a public road. Likewise, there can be an abandonment by nonuse for a period short of the time of prescription

7

when there has been the construction of a new highway replacing an old road"). There also was conflicting evidence about members of the public continuing to use the unnamed road to access the Tallapoosa River up until a couple of years before trial and about the county having graded the unnamed road one or more times after 1976 and as recently as 2014.

On July 12, 2017, Landrum filed a complaint in the trial court against Barber, Owens, and Hyatt, who he alleged were members of the hunting club, which leased land (apparently from the Twilley beneficiaries) on which at least part of the unnamed road is located. Landrum sought a declaration that the unnamed road was a public, county road and an injunction requiring the removal of the gate that had been placed across the unnamed road near the intersection with County Road 5.[7] Landrum alleged that the unnamed road had been in existence as a public road for over 100 years and had been used by the public to access the Tallapoosa River from County Road 5, in addition to being

---

[7]After establishing that a pertinent part or all of the unnamed road was a public, county road, Landrum intended to file an action to condemn an easement from his property to the unnamed road or to otherwise establish a legal right to access the unnamed road.

used by landowners to access their respective properties from County Road 5. Landrum subsequently filed an amended complaint.

Barber and Goss own a parcel of land on either side of the unnamed road where it intersects County Road 5, and they leased their land to the hunting club. Goss eventually was added as a defendant in Landrum's action, as was the hunting club. Also, Tallapoosa Timberlands, LLC, which leased property from the Twilley beneficiaries, and RMS, which conducted timber-harvesting operations and management for Tallapoosa Timberlands, LLC, were added as defendants, along with the Commission. The private-party defendants, less the Twilley beneficiaries, who had not yet been made parties in Landrum's action, see Landrum, supra, are hereinafter referred to as "the original private-party defendants."

The original private-party defendants and the Commission filed answers denying the material allegations in Landrum's complaint and some of the original private-party defendants filed a counterclaim requesting that the trial court declare the unnamed road to be a private road. The trial court held ore tenus proceedings in September 2019. At trial, the original private-party defendants and the Commission argued

9

that Landrum had failed to establish that the unnamed road was a public, county road. They also argued that, if Landrum had established that the unnamed road was a public, county road, the unnamed road had been abandoned through nonuse. In response, Landrum contended that he had established that the unnamed road was a public, county road based on common-law, implied dedication. Landrum also contended that he had established that the unnamed road was a public, county road because "you can see clearly on the 1970 format that that is a public road," presumably referring to Landrum's exhibit 5, which was a copy of a 1974 general highway map of Randolph County that was prepared by the State Highway Department Bureau of Planning and Programming Surveying and Mapping Division in cooperation with the United States Department of Transportation ("the 1974 map"). Landrum further argued that the unnamed road had not been vacated by the Commission and that there was no clear and convincing evidence that it had been abandoned by the public.

After the filing of posttrial briefs, which the trial court had requested, the trial court entered an order on April 7, 2020, declaring that Landrum had established, based on common-law implied dedication,

10

that "the road designated County Road 968" was a public road beginning at County Road 5 and running to the Tallapoosa River and enjoining the maintenance of the gate. The trial court also noted that "[n]ot all public roads are 'county roads'" but that County Road 968 was a county road.[8]

_____

[8]Landrum admitted at trial that the unnamed road had been labeled "County Road 968" when the county 911 system was upgraded during the mid-1990s. There was some suggestion that the contractor that the county had retained to perform that upgrade had provided the names for unnamed roads and had made mistakes during that process. That suggestion is in conflict, however, with the fact that the 911 system indicated that County Road 968 ended after 1.8 miles and well before the Tallapoosa River, but a parcel-viewer map from the Randolph County Revenue Commissioner indicated that County Road 968 ran to the Tallapoosa River. Pam Taylor, who was the Randolph County Revenue Commissioner at the time of trial, testified that county road numbers had not always been known and placed on the parcel-viewer maps when they were created in 1974 by her predecessor in office; that she and Jones had not updated the maps as they had been instructed to do in the early 2000s; that the particular parcel-viewer map at issue was not one she would use; that she preferred a map that indicated that County Road 968 ended as it turned in a northerly direction toward -- but well short of -- Crooked Creek, rather than in a northeasterly direction toward the Tallapoosa River; and that she believed a mistake had been made on the parcel-viewer map at issue regarding the designation of County Road 968 as including the portion of the unnamed road that extended to the Tallapoosa River. Even assuming that that was the case, however, in light of the historical location of the unnamed road as extending from County Road 5 to the Tallapoosa River, such a mistaken labeling of the unnamed road as County Road 968 along its entire length on the parcel-viewer map at issue supports an inference that the information on that parcel-viewer map had not been derived from the 911 system, which did not include the Tallapoosa River part of the unnamed road as part of

The trial court noted that the unnamed road had been used by the public when C.C. Twilley had acquired and owned his property, that homeplaces had existed on that property before C.C. Twilley had acquired it, that the public had used that property to access a ferry in the area before C.C. Twilley had acquired his property, and that the general public had used the unnamed road to access the river for recreation. The trial court also noted that, although there was conflicting testimony regarding whether the county had "scraped" the unnamed road as a part of road maintenance, the County had placed and replaced "County Road 968" signage on the road and had placed a stop sign on the road where it intersected County Road 5; Jones testified that he had placed a stop sign where the unnamed road entered County Road 5 when he replaced the County Road 968 sign that had been removed after Landrum had purchased his property from Stephens. The trial court also noted that the county's "mapping system list[ed] the road as a county road,"

---

County Road 968 -- the 911 system did not show that part of the unnamed road at all -- but from some other source showing a public, county road that ran from County Road 5 to the Tallapoosa River.

apparently referencing the parcel-viewer maps that were admitted into evidence at trial.

On May 7, 2020, and May 18, 2020, respectively, the Commission and the original private-party defendants filed respective motions arguing that that the trial court had erred by concluding that the unnamed road was a public, county road and that, based on the multiple maps presented at trial and the testimony from various witnesses as to the location of different roads that led or had led to the Tallapoosa River, the location of the unnamed road could not be determined from the April 2020 order ("the May 2020 motions").[9] We concluded in Landrum that the April 2020 order was not a final judgment and that the May 2020 motions had been improperly designated as postjudgment motions

_____

[9]As part of their argument, the original private-party defendants represented to the trial court that the Commission had no interest in maintaining the unnamed road because of the cost of doing so. They further stated that the abutting owners of the land traversed by the unnamed road would arrange to vacate it upon any adverse ruling and that the trial court should not attempt to delay the inevitable. The original private-party defendants failed to note, however, that any such attempted vacation would involve consideration of access rights that might be affected. See Ala. Code 1975, § 23-4-20(a) & (d)(2) (discussing the preservation of other property owners' respective rights to ingress and egress as part of a proceeding to vacate a road).

because of the remaining dispute as to the location of the road at issue in light of testimony regarding the existence of more than one road that ran to the Tallapoosa River. 342 So. 3d at 577. Instead, we concluded that the May 2020 motions were motions requesting that the trial court enter a final judgment that adjudicated what road or parts of roads constituted the public, county road at issue. Id.

On August 11, 2020, the trial court entered a judgment denying the May 2020 motions and declining to amend the April 2020 order except to make the following change:

> "'In an effort to clarify the intended boundaries of the roadway at issue, County Road 968, the ... April ... 2020 [order], is amended to reflect the intent of the Court that County Road 968 begins at the intersection of County Road 5 and continues to an orange marking as depicted on [Landrum's exhibit] #3 map. The same road is depicted on [the Commission's exhibit] #26A. Said road is depicted in green and highlighted in orange. And also shown on [the original private-party] defendant's [exhibit] #1 to a red mark.'"

342 So. 3d at 577. The marks referenced on the exhibits described in the amendment to the April 2020 order reflect that the termination point of County Road 968 was relatively near the second of two forks in the unnamed road that were discussed at trial; from the second fork, the

14

right fork ran in a northeasterly direction to the Tallapoosa River and the left fork ran in a northerly direction toward, but well short of, Crooked Creek and Landrum's property. We read the amended language as leaving intact the trial court's determination that the unnamed road remained a public road for its entire length to the Tallapoosa River, i.e., as including the right fork, particularly in light of the lack of any determination that that part of the unnamed road had been abandoned by nonuse, although we are not clear as to what evidentiary basis there was to conclude that the unnamed road was only a county road to the extent described in the language quoted above.[10]

---

[10]The determination that County Road 968 ended well before it reached the Tallapoosa River was consistent with evidence indicating that that part of the unnamed road was impassable to two-wheel drive vehicles when the 911 system was upgraded, although it had previously been established as a public, county road based on the public use of the road to access the Tallapoosa River. See discussion, infra. However, the fact that it was impassable at one point in time is not the same as it being permanently impassable, and, as noted above, there was also evidence indicating that, up until a few years before trial, members of the public had still accessed the river using the unnamed road, including with vehicles. No party argues that the trial court erred by not concluding that County Road 968 extended to the Tallapoosa River. See Davis v. Linden, 340 So. 2d 775, 777 (Ala. 1976); Purvis v. Busey, 260 Ala. 373, 378, 71 So. 2d 18, 22 (1954).

On September 8, 2020, Landrum, the Commission, and the original private-party defendants filed a joint motion, purportedly pursuant to Rule 60(b), Ala. R. Civ. P., seeking to supplement the April 2020 order because they were concerned that the August 2020 judgment had been entered after the May 2020 motions purportedly had been denied by operation of law. See Landrum, 342 So. 3d at 577 n.7. The trial court entered an order granting the purported Rule 60(b) motion and amending the April 2020 order to include the same language regarding the intended boundaries of County Road 968 it had included in the August 2020 judgment. In the September 2020 order, the trial court acknowledged that the April 2020 order had failed to adequately identify the location of the public, county road and that, for the April 2020 order "to have any meaning to the parties with respect to finalizing the issues," that order had to be supplemented.

The original private-party defendants and the Commission timely appealed to the supreme court, which transferred the appeals to this court, pursuant to Ala. Code 1975, § 12-2-7(6).[11] This court reversed the

_____

[11]We note that, even assuming that our conclusion as to the lack of finality of the April 2020 order was incorrect, the Commission and the

16

order and remanded the case so that the trial court could comply with Rule 19, Ala. R. Civ. P. See Landrum, supra. As noted above, on remand, the Twilley beneficiaries were added as defendants, and they requested that the trial court enter a judgment after aligning them with the original private-party defendants and without conducting a new trial. The trial court granted that motion and, on June 10, 2022, entered a judgment expressly adopting the April 2020 order and the August 2020 judgment as its final judgment.

On July 13, 2022, the private-party defendants submitted a proposed corrected final judgment. See George v. Sims, 888 So. 2d 1224, 1227 (Ala. 2004) ("Generally, a trial court has no jurisdiction to modify or amend a final order more than 30 days after the judgment has been entered, except to correct clerical errors."). On July 18, 2022, the trial court entered a corrected judgment that, in addition to referencing and adopting the April 2020 order, referenced and adopted the September

---

original private-party defendants' respective appeals in Landrum were timely filed because, assuming their purported May 2020 motions were postjudgment motions that were denied by operation of law a few days before the entry of the August 2020 judgment, their notices of appeal were timely filed in relation to the date of such denials.

17

2020 order in lieu of the purported August 2020 judgment described in the June 2022 judgment. Landrum did not object to the correction of the June 2020 judgment, and, as noted above, the September 2020 order and the August 2020 judgment used identical language for the location of County Road 968. See S.L.J.F. v. Cherokee Cnty. Dep't of Hum. Res., 165 So. 3d 607, 609 n.2 (Ala. Civ. App. 2014) (noting that the correction of a judgment "under Rule 60(a), Ala. R. Civ. P., is not a new judgment"). Thus, we consider the correction to be immaterial to our review.

On July 20, 2022, the private-party defendants filed their notice of appeal to this court, and, on July 21, 2022, the Commission filed its notice of appeal to this court. We transferred the appeals to the supreme court for lack of jurisdiction. The supreme court then transferred the appeals to this court, pursuant to § 12-2-7(6), Ala. Code 1975. Also, this court granted the appellants' joint motion to incorporate the record on appeal from Landrum.

The presumptions of correctness attending the ore tenus rule apply to this court's review in the present case. Thus,

"'"[w]e must accept as true the facts found by the trial court if there is substantial evidence to support the trial court's findings."' Allsopp v. Bolding, 86 So. 3d 952, 959 (Ala. 2011)

18

(quoting Beasley v. Mellon Fin. Servs. Corp., 569 So. 2d 389, 393 (Ala. 1990)).  This standard is based on a recognition of the trial court's unique position of being able to evaluate the credibility of witnesses and to assign weight to their testimony."

Wehle v. Bradley, 195 So. 3d 928, 934 (Ala. 2015).  Also,

"[w]hen the trial court does not make any specific finding of fact on a matter pertinent to its judgment,

> "'this Court will assume that the trial judge made those findings necessary to support the judgment....  Under the ore tenus rule, the trial court's judgment and all implicit findings necessary to support it carry a presumption of correctness and will not be reversed unless "found to be plainly and palpably wrong." ...  "The trial court's judgment in such a case will be affirmed, if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment."'

"Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A., 608 So. 2d 375, 378 (Ala. 1992)."

Russell Petroleum, Inc. v. City of Wetumpka, 976 So. 2d 428, 431-32 (Ala. 2007).

"The deference owed a trial court under the ore tenus standard of review, however, does not extend to the trial court's decisions on questions of law.  Appellate review of questions of law, as well as whether the trial court has properly applied that law to a given set of facts, is de novo."

Wehle, 195 So. 3d at 934.

The private-party defendants and the Commission challenge the trial court's determination that what it determined was County Road 968 had been established as a public, county road based on common-law dedication. Based on the evidence presented at trial and certain facts of which this court may take judicial notice, we find that contention to be without merit. We likewise conclude that the trial court's implicit rejection of the argument that County Road 968 had been abandoned to be supported by the evidence.

> "A public road may be established by common law dedication, statutory proceeding, or by prescription. … An open, defined roadway, through reclaimed land, in continuous use by the public as a highway without let or hindrance for a period of twenty years becomes a public road by prescription. When such circumstances are shown, a presumption of dedication or other appropriation to a public use arises. The burden is then on the landowner to show the user was permissive only, in recognition of his title and right to reclaim the possession. …

> "In Benson v. Pickens County, 260 Ala. 436, 70 So. 2d 647 (1954), it was noted that the above principles were not applicable to wooded or unimproved lands or lands which, though once reclaimed, had been 'turned out' or left open and unused. Instead, where the road runs over unimproved or 'turned out' lands there is no presumption of dedication by mere use; rather there is a presumption of permissive use and the user must establish his use as adverse to that of the owner. This principle is grounded on sound policy. Otherwise, an owner with no present use for the land over

20

which a road runs would be required to suffer the expense of taking affirmative action to prevent travel over his unused land to avoid having a public road established on that land."

Ford v. Alabama By-Prods. Corp., 392 So. 2d 217, 218-19 (Ala. 1980).

As noted above, the evidence presented at trial included the 1974 map, and Landrum directed the trial court to that map in support of his argument regarding the nature of the unnamed road. See Rules 803(8) and 803 (16), Ala. R. Evid. (respectively, setting forth the public-records and ancient-document exceptions to the hearsay rule); Ullman Bros. v. State, 16 Ala. App. 526, 528, 79 So. 625, 627 (1918) (noting "the rule recognizing ancient maps and ancient documents as competent evidence of what they tend to show"). The 1974 map was compiled from aerial photographs taken in 1966 and a field examination in 1973. The 1974 map reflects the unnamed road, although its intersection with what was eventually named County Road 5 was at a fork in that road, rather than the "T" intersection reflected on earlier maps of which we have taken judicial notice, see discussion infra, and that fork was located south of the intersection claimed by Landrum as the beginning point of the unnamed road on County Road 5. The more northerly intersection was added at some point between 1974 and 1992, and it appears that that

entrance would have eased the transition from the unnamed road to the paved part of County Road 5 as it headed in a northwesterly direction toward Cragford; the older southerly intersection (as reflected on the 1974 map) required the navigation of a very sharp turn and that intersection was located approximately where the paved part of County Road 5 ended and unpaved County Road 848 began headed in a southerly and then southeasterly direction toward Malone. See discussion, infra and note 6, supra.[12] Also, based on a comparison of the 1974 map with earlier maps and certain testimony at trial, the unnamed road had been improved from its previously unimproved condition to a "gravel or stone road" throughout its entire length, although it does not appear to have been subsequently maintained in that condition, and portions of that road may have been shifted to the west and north of their original location (the apparent shift, however, may merely have been based on the use of aerial photography in creating the 1974 map).

---

[12]We note that the parties presented no argument regarding the import of either intersection insofar as the issue whether the unnamed road was a public, county road. Also, County Road 848 and County Road 5 apparently were at one time referred to on the revenue commissioner's map system as the "Malone-Cragford Road."

We note that the private-party defendants and the Commission presented State Highway Department maps from 1984 and 2000 that did not include the unnamed road, and they attempted to imply that the unnamed road might have been a private road. However, such an implication is squarely at odds with the testimony that the trial court had discussed in the April 2020 order in support of its conclusion that the unnamed road was a public, county road and with the nature of the maps at issue reflecting the highways of Randolph County, see Black's Law Dictionary 876 (11th ed. 2019) (defining "highway" as "[a] free and public roadway or street that every person may use"); 39 Am. Jur. 2d Highways, Streets, and Bridges § 1 (2019) ("The term highway refers to a road, main road, public road, or thoroughfare .... The essential feature of a highway is that it is a way over which the public at large has the right to pass, or may lawfully pass, as a road or way open to the use of the public, particularly for vehicular traffic. … The term highway is ordinarily used in contradistinction to a private way, over which only a limited number of persons have the right to pass, and the expression private highway is a misnomer and public highway is tautology." (footnotes omitted)). That implication is also belied by Jones's statement to Landrum that he

believed that the unnamed road had been abandoned and does not adequately account for the import of the presence of the predecessor to the unnamed road on earlier maps, see discussion infra, or the recurrence of the unnamed road on the 1992 general highway map of Randolph County prepared by the State Highway Department Bureau of State Planning Surveying and Mapping Division in cooperation with the U.S. Department of Transportation ("the 1992 map"), which was compiled from aerial photographs taken in 1985 and a field examination in 1991. See 3M Co. v. Dunn, 50 Ala. App. 329, 333, 279 So. 2d 132, 136 (Civ. App. 1973) (discussing the taking of judicial notice as to official maps); see also Hinds v. Federal Land Bank of New Orleans, 237 Ala. 218, 220, 186 So. 153, 154 (1939); McMillan v. Aiken, 205 Ala. 35, 42-43, 88 So. 135, 141-42 (1920). The 1992 map reflects the unnamed road as a "gravel, stone, or soil road" and, as compared to the 1974 map, the intersection of the unnamed road with what eventually was named County Road 5 had been moved to the location where Landrum claimed the unnamed road began. Interestingly, the private-party defendants and the Commission apparently failed to locate the 1992 map in their search to locate maps reflecting the highways of Randolph County, and Jones indicated that he

24

had ceased searching for maintenance records as to the unnamed road in 1993, purportedly on the basis that that was when the computer records began, although he conceded that maintenance records from before 1993 might have existed. Jones also admitted that he had performed only a cursory search of records to determine whether the unnamed road had been vacated, which is odd given that, if such a proceeding had occurred, it would likely have been between 1974 and 1984 based on the maps presented at trial.

As noted above, the trial court determined in the April 2020 order that common-law dedication of the unnamed road had been established based, in part, on evidence regarding past public use of that road to access houses and a ferry on the Tallapoosa River. That finding was supported by the evidence, particularly when considered in light of the fact that the unnamed road is on the 1974 map and is further buttressed by past maps reflecting the predecessor to the unnamed road. See 3M Co., Hinds, and McMillan, supra. The 1937 General Highway and Transportation Map of Randolph County prepared by the State Highway Department in cooperation with the U.S. Department of Agriculture Bureau of Public Roads based on data obtained from the State-Wide Highway Planning

Survey, reflects that an unnamed, "unimproved road" began at a "graded and drained road" (what eventually was designated as County Road 5)[13] approximately one mile south of New Hope Church and the public school that was located across the street from that church. That unimproved road ran in a westerly then northwesterly direction for a few miles to the western bank of the Tallapoosa River, where a ferry was located; houses and farm units were "in use" along the road. That unnamed road also included a fork in the approximate location of the second fork in the unnamed road that was discussed at trial. The right fork (part of the unnamed road) ran to the ferry and the other fork ran in a northerly direction ("the north-fork road"), with two farm units in-use near the fork. The north-fork road appears to be consistent with an old roadbed depicted on the parcel-viewer map that Taylor preferred to use, see note 8, supra, but the north-fork road continued further and ran to the area where Crooked Creek intersected the Tallapoosa River. Also, the north-fork road included a fork with another unnamed road -- with a house, several

_____

[13]It is unclear from the record when County Road 5 received that name. The first general highway map designating that road as County Road 5, rather than having no name, is the 2000 map, although that road had long been a paved, county road.

farm units, and a sawmill in use along its length -- that ran in a westerly direction to intersect the "graded and drained road" (what was eventually designated as County Road 5) approximately one mile north of New Hope Church. In other words, the predecessor to the unnamed road and the other unnamed roads formed a loop around New Hope Church and provided routes for access to houses, farms, a sawmill, and the ferry from both the north and the south from a "graded and drained road" that eventually was designated County Road 5.

On the 1937 map, on the opposite side of the Tallapoosa River from the unnamed road, the ferry joins another unnamed road that continues in a northwesterly direction towards Wedowee. The 1937 map also indicates that there were houses or farm units "in use" near the Tallapoosa River end of that road. The foregoing information is likewise reflected on the 1938 Traffic Flow Map of Randolph County prepared by the State Highway Department in cooperation with the Federal Works Agency Public Roads Administration, based on data obtained from the State-Wide Highway Planning Survey, and on the 1948 General Highway Map of Randolph County prepared by the State Highway Department in cooperation with the U.S. Department of Commerce Bureau of Public

Roads, based on data obtained from the State-Wide Highway Planning Survey.

It is unclear from the record exactly when C.C. Twilley purchased his properties, but it is clear from the record that either before or after those purchases, and certainly before 1974, the public use of the unnamed road under claim of right had been established. The record included testimony indicating that the grandfather of Wayne Vinson had owned a house at the end of the unnamed road where Vinson's mother was born and that his grandfather had owned and operated the ferry (although counsel for the original private-party defendants apparently confused Vinson at trial regarding the location of the unnamed road). Based on a 1911 U.S. Geological Survey Soil Map prepared by the U.S. Department of Agriculture, the ferry was referred to as the Wellborne Ferry. Both the referenced unnamed roads and the ferry would have been known to the court of county commissioners, the predecessor entity to the county commission. See Tuscaloosa Cnty. v. Foster, 132 Ala. 392, 400, 31 So. 587, 589 (1902) (discussing the requirement that "all ferries crossing a stream with a public road must be licensed" through the court of county commissioners in accordance with pertinent statutes); see also

Ala. Code 1975, § 11-3-10 (discussing the authority of the county commission regarding "the establishment, change, or discontinuance of roads … and ferries within the county, except where otherwise provided by law, to be exercised in conformity with the provisions of this Code"), and predecessor statutes back to Ala. Code 1852, § 703 (stating that the court of county commissioners "possesses original jurisdiction in relation to the establishment, change, or discontinuance of roads … and ferries, within its county; to be exercised in conformity with the provisions of this code"). See generally 26 C.J.S. Dedication § 17 (2022) ("What amounts to a dedication by implication depends on the facts of the particular case, and no hard and fast rule can be laid down as a guide for the courts. Evidence with respect to a dedication may be found on maps or plats, either supporting or rejecting the implied dedication. Acquiescence of a landowner, without objection, in a public use for a long time, is such conduct as proves and indicates to the public an intention to dedicate." (footnotes omitted)).

Based on the foregoing, what appears to have been the predecessor to the unnamed road had long served as a road to access houses, farms, and a ferry across the Tallapoosa River, and the ferry had led to another

29

unnamed road that had continued toward Wedowee. There is no evidence indicating that any of the houses were occupied after the early 1960's and, at some point before 1974, the ferry was no longer in use. No structures or the ferry are reflected on the 1974 map or later maps and those maps likewise do not reflect the north-fork road or the other unnamed road running in a westerly direction from the north-fork road. Nevertheless, although the properties abutting the unnamed road had been used for timber and hunting since the 1960's, the unnamed road clearly had remained a public, county road based on the 1974 map and based on the evidence presented at trial indicating that the unnamed road continued to be used by members of the public before and after the 1970s to access the Tallapoosa River. See CRW, Inc. v. Twin Lakes Prop. Owners Ass'n, Inc., 521 So. 2d 939, 941 (Ala. 1988) (stating that "[i]t is the character, rather than the quantum, of use which forms the test for determining whether a road is public or private"); see also Powell v. Hopkins, 288 Ala. 466, 472, 262 So. 2d 289, 294 (1972).

There was testimony indicating that the unnamed road was used by owners of property abutting Crooked Creek to access their respective properties, although those property owners assumed that they had

30

needed permission to use the unnamed road. According to James Perry, C.C. Twilley placed the first gate near the entrance to that road in 1961.[14] However, as noted above, there was conflicting evidence regarding whether a gate was continuously present at the entrance to the unnamed road and regarding the extent to which any such gate had remained closed. For example, there was testimony indicating that the gate might be open or closed depending on whether it was hunting season. As noted above, there was also evidence indicating that the public had continued to use the unnamed road to access the Tallapoosa River, including with vehicles. See 39 Am. Jur. 2d Highways, Streets, and Bridges § 117 (2019) ("The acts of private landowners are generally insufficient, alone, to establish the abandonment of a public road or highway, as by the erection

---

[14]James Perry testified that his family had owned property in the area at issue for 110 years and that he had obtained his "landlocked" property from his father. In light of the north-fork road and other unnamed roads indicated on the 1937, 1938, and 1948 maps, it is unclear when or how Perry's property may have become "landlocked." Also, although Perry testified that he believed his access, and his father's access, to his property had been by permission, at least after C.C. Twilley erected a gate at the entrance to the unnamed road in 1961, the trial court could have discounted that testimony in light of the fact that Perry's access to his property had been threatened by a previous disagreement with the hunting club over the gate.

of fences, gates, or barriers to public usage, given the principle that a private landowner has no right to treat a public highway as a private roadway so as to force the abandonment of the public highway." (footnotes omitted)); cf. Alexander-City Union Warehouse & Storage Co. v. Central of Georgia Ry. Co., 182 Ala. 516, 524, 62 So. 745, 747 (1913) ("No adverse possession of land which is devoted to the use of the public for a street or a road can ever ripen into or give rise to a title to such land. Every such use is necessarily an obstruction of the highway and a public nuisance which no lapse of time can legalize.").

Based on the foregoing, we reject the argument of the private-party defendants and the Commission that the trial court erred by concluding that County Road 968 was a public, county road, and we see no reason for an extended discussion as to the trial court's rejection of the argument that County Road 968 had been abandoned. Proof of abandonment based on nonuse of a public road must be by clear and convincing evidence. There is little evidence indicating that the public ceased using the unnamed road to access the Tallapoosa River before 1974, and certainly not evidence of a particular 20-year period of nonuse. Also, as noted above, there was evidence of continuing public use of the unnamed road,

including the part designated County Road 968, for purposes of accessing the Tallapoosa River, particularly from the 1970s through a few years before trial. See Autry v. Clarke Cnty., 599 So. 2d 590, 591 (Ala. 1992); see also Bownes v. Winston Cnty., 481 So. 2d 362, 363-64 (Ala. 1985) (discussing " '[t]he ancient maxim, "once a highway, always a highway" ' " (quoting 39 Am. Jur. 2d Highways, Streets and Bridges, § 139 at 512-13 (1968))). The failure of county authorities to maintain a road does not require a finding of abandonment by the public. See Auerbach v. Parker, 544 So. 2d 943, 946 (Ala. 1989). Likewise, the fact that travel on the road may have decreased does not require a finding of abandonment. Id. (stating that the Auerbachs "in recent times have used the road mainly on weekends for recreation, the game warden and Auerbach employees also use the road to reach the Auerbach property. Thus, the road is open for use, albeit infrequently."). See also Laney v. Garmon, 66 So. 3d 766, 769 (Ala. Civ. App. 2010) ("The testimony in this case shows that before Garmon blocked access to the disputed roadway in 2000, it was infrequently used, it was in a bad state of repair, and it was not maintained by the county. However, even the combination of those facts is insufficient to prove by clear and convincing evidence that the disputed

33

roadway had been abandoned as a public road.").  In conclusion, based on the evidence presented at trial, the trial court was not required to conclude that what it determined to be County Road 968 had been unused by the public for 20 years, whether that period was measured as beginning before or after 1974.  See Bownes, supra.

The June 2022 judgment is affirmed.

CL-2022-0848 -- AFFIRMED.

CL-2022-0854 -- AFFIRMED.

Thompson, P.J., and Moore, Hanson, and Fridy, JJ., concur.